50 A.3d 1075

**Dorothy M. TRACEY**

**v.**

**Anthony K. SOLESKY and Irene Solesky, as the Parents, Guardians and Next Friends of Dominic Solesky, a Minor.**

**No. 53, Sept. Term, 2011.**

Court of Appeals of Maryland.

April 26, 2012.

As Amended on Reconsideration Aug. 21, 2012.

628

Richard E. Schimel (Budow and Noble, P.C., Bethesda, MD), on brief, for Petitioner/Cross–Respondent.

Clifford A. Robinson (H. Barritt Peterson, Jr. & Associates, Towson, MD), on brief, for Petitioner/Cross–Respondents.

Kevin A. Dunne (Matthew T. Vocci of Ober, Kaler, Grimes & Shriver, Baltimore, MD), on brief, for Respondents/Cross–Petitioners.

Debora M. Bresch, New York, NY, for Amicus Curiae brief of American Society for the Prevention of Cruelty to Animals in Support of Appellant.

Don Bauermeister, Council Bluffs, IA, for Amicus Curiae brief of Dogsbite.Org in Support of Appellees.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, ALAN M. WILNER (Retired, Specially Assigned), and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

DALE R. CATHELL, (Retired, Specially Assigned), J.

In Maryland the vicious mauling of young children by pit bulls occurred as early as 1916.[1] *Bachman v. Clark,* 128 Md. 245, 97 A. 440 (1916). In that case, a ten-year-old boy, John L. Clark, was playing on the north side of a street when a pit

---

1. While there were prior dog bite cases, we believe that this case was the first instance where the attacking dog is described as a bull terrier.

bull ("bull terrier") came across the street from its owner's property and attacked him, inflicting serious injuries. The pit bull refused to release the boy until a witness picked up a "scantling"[2] and struck the dog, killing it. Similar to the testimony in the present case by the boy's mother, in that old case the mother described the aftermath of the attack on her child as follows:

> ... [H]e was unconscious, in such a condition that she did not know whether he was living or dead ... Blood all over him.

*Id.* at 247, 97 A. at 440.

Over the last thirteen years, there have been no less than seven instances of serious maulings by pit bulls upon Maryland residents resulting in either serious injuries or death that have reached the appellate courts of this State, including the two boys attacked by the pit bull in the present case.[3] Five of the pit bull attacks in Maryland have been brought to the attention of this Court, and two have reached the Court of Special Appeals.

The first two attacks to reach this Court were reported in *Shields v. Wagman, et al.*, 350 Md. 666, 714 A.2d 881 (1998),[4] where a pit bull attacked a business invitee at a strip shopping center and later attacked a tenant. Both attacks took place in the parking area of the strip-shopping center owned and maintained by the landlord. The pit bull was kept by its owner, also a tenant who operated an automobile repair business on leased premises.

---

**2.** A small piece of timber such as a 2″ by 4″ or similar piece of framing, etc.

**3.** In addition to the maulings in Maryland, there have been at least two instances of serious maulings by pit bulls that have reached the appellate courts of the District of Columbia, *infra*, since 2005. Accordingly, within a hundred mile radius there have been nine serious mauling appellate cases involving pit bulls within the last thirteen years.

**4.** Two cases were consolidated for trial below.

In the first instance, Ms. Shields took her car to the parking area for repairs, and as she exited her car and approached the leased premises, the pit bull broke through the door and attacked her, inflicting serious injuries. *Id.*, at 670, 714 A.2d at 883.[5] In the second instance, the pit bull was not restrained and chased another tenant in the shopping center, Mr. Johnson, onto the roof of a car in the parking lot and attacked him, again inflicting serious injuries. As a result, Mr. Johnson had several surgeries to his arm, lost sensation in that arm, and was impaired in his ability to perform certain duties related to his job. *Id.*, at 671, 714 A.2d at 883. This Court held that the landlord in that case had actual knowledge that the pit bull (whose name was Trouble) was dangerous and had the right to cause the removal of the pit bull from the premises but failed to do so, and in not so doing, had negligently allowed the attacks to occur on the parking premises controlled by the landlord. *Id.*, at 690, 714 A.2d at 892–893.

The third case decided by this Court just two months later, *Matthews v. Amberwood Associates Limited Partnership, Inc.*, 351 Md. 544, 719 A.2d 119 (1998), involved a situation where a pit bull (named Rampage) attacked a child inside a tenant's apartment killing the child. We found that because the landlord's employees had reported Rampage's aggressiveness and viciousness on prior occasions to management personnel, that knowledge was imputed to the landlord even though the attack occurred in the premises leased to the tenant. *Id.*, at 588–59, 719 A.2d at 125–26. Accordingly, because the landlord had the right not to renew the lease or to remove the pit bull under a "no pets" provision in the lease, he could be held liable. *Ibid.*

In *Moore et al. v. Myers*, 161 Md.App. 349, 868 A.2d 954 (2005), a case originating out of Prince Georges County, the Court of Special Appeals was faced with a factual situation in which an unleashed and unrestrained pit bull chased a twelve

---

5. In the hospital she underwent emergency surgery and was hospitalized for a week. She later had to return to the hospital for further surgeries. She lost four months of work.

year old girl into a street where she was run over by an automobile and suffered two broken arms, a broken leg, and a fractured jaw.[6] At the time, Prince Georges County had adopted statutes specific to pit bulls that, among other things, required owners of pit bulls to keep the dogs in enclosures or leashed at all times. *Id.,* at 364, 868 A.2d at 962. Based primarily on a violation of those statutes, the Court of Special Appeals held the owner of the pit bull liable. *Id.,* at 367, 868 A.2d at 964.

In *Ward v. Hartley,* 168 Md.App. 209, 895 A.2d 1111 (2006) (in which the relevant party in the lawsuit was the landlord), a taxi driver was dispatched to pick up a passenger for transportation to the Kennedy Kreiger Institute. When he knocked on the door to the leased premises, he heard someone tell children not to open the door. He stepped back and at the same time a child opened the door and a pit bull came charging out as he heard someone yell "Get the dog." He hit the pit bull with some rolled-up paper he had in his hand and the pit bull grabbed his foot. He then ran to his cab with the pit bull still holding onto his foot and, with the pit bull still attached, climbed on top of the car. A police car appeared on the scene, and as it did, two boys ran out of the house laughing and pulled the dog off of the cabdriver's foot. The cab driver's foot was severely injured and required surgery. *Id.,* at 213, 895 A.2d at 1113. There was no evidence in the case that the landlord knew that a pit bull was being kept on the premises until he heard about the incident with the cab driver. The Court of Special Appeals, in holding for the landlord, opined: "Keeping a pit bull did not violate any covenant of the lease, nor did it violate any law or ordinance. No provision of the lease gave the landlord control over any portion of the rental premises. Thus, appellees had no duty to inspect the premises." *Id.,* at 217, 895 A.2d at 1115.

The present case involves an attack by a pit bull named Clifford. Notwithstanding his relatively benign name, Clifford

---

6. Apparently, the son of the owner 'sicced' the pit bull on three girls, one of whom was the victim.

possessed the aggressive and vicious characteristics of both Trouble and Rampage. He escaped twice from an obviously inadequate small pen [7] and attacked at least two boys at different times on the same day.[8] The second young boy was Dominic Solesky. As a result of his mauling by Clifford, Dominic initially sustained life threatening injuries and underwent five hours of surgery at Johns Hopkins Hospital to address his injuries, including surgery to repair his femoral artery. He spent seventeen days in the hospital, during which time he underwent additional surgeries, and then spent a year in rehabilitation.[9]

Here, the trial court granted a judgment for the defendant landlord at the close of the Plaintiff's case on the grounds that, according to the trial judge, the evidence was insufficient to permit the issue of common law negligence to be presented to the jury. On the state of the common law relating to dog attacks in existence at that time, the trial court was correct The plaintiff took an appeal to the Court of Special Appeals

---

**7.** The pen was described as being 4 feet high with no overhanging ledge and an open area at the top. Clifford jumped out of the top of the pen at least twice on the day of the attacks. In *Matthews v. Amberwood, supra,* at 563, 719 A.2d 119, we quoted language from the New Mexico case of *Garcia v. Village of Tijeras,* 108 N.M. 116, at 119–121, 767 P.2d 355 (1988) that "... extraordinary measures are required for confining American Pit Bull Terriers, such as a *six* [emphasis added] foot chain-link fence with an overhanging ledge to keep the dogs from jumping out, ..."

**8.** After he attacked the first boy, the pit bull's owner apparently restrained the dog and put him back in the pen he had just jumped out of, whereupon, in a short period of time the pit bull jumped out of the pen again and attacked the second boy, Dominic.

**9.** The first boy attacked, Scotty Mason, was described after the attack on him as he appeared before his mother (an assistant States Attorney for Baltimore City) as:

He was hysterical. He was bloody from about the chest area up. His face was covered in blood. He was crying. He didn't look like Scotty. I thought he had been hit by a baseball bat....

\* \* \*

Well, he was unable to talk. He was so hysterical, but the two older boys told me he had been attacked by a dog, and I was frankly shocked ...

and that court reversed the trial court, finding that the evidence had been sufficient to create a valid jury issue as to the extent of the landlord's knowledge as to Clifford's dangerousness in respect to the then common law standards in dog attack negligence cases.

Appellant, the landlord, presented several questions in her brief before this Court.

1. Is the harboring of American Staffordshire Terriers (more commonly known as "pit bulls") by tenants an inherently dangerous activity for which landlords may be held strictly liable?

2. Does Maryland jurisprudence permit an inference of knowledge of prior vicious propensities of a domestic animal by a landlord based upon the existence of an exculpatory clause in a residential lease concerning bodily injury caused by the tenant's pets?

3. Does Maryland jurisprudence permit an inference of knowledge of prior vicious propensities of a domestic animal by a landlord whose tenant harbors the animal in leased premises based upon subjective conclusions as to the animal's temperament of neighbors who have limited observations of the animal's behavior which was never conveyed to the landlord?

4. May a landlord be held liable for injuries caused by a tenant's domestic animal due to the failure to require reasonable confinement of a domestic animal in the leased premises?

5. Should landlords that allow tenants to harbor dangerous or vicious animals in the leased premises be held liable in tort under any circumstances when the tenant fails to properly control its pet?

6. Should this Court's prior rulings in *Mathews* [*Matthews*] *v. Amberwood Associates Ltd. P'ship, Inc.*, 351 Md. 544 [719 A.2d 119] (1998) and *Shields v. Wagman*, 350 Md. 666 [714 A.2d 881] (1998) be overturned or significantly modified?

The appellee, cross-petitioner, Solesky, presents six questions in his brief.

 I. After *Shields and Matthews*, was the inherently dangerous/vicious nature of pit bulls known to Maryland landlords?

 II. Did *Matthews* impose a duty upon landlords who rent to tenants with pit bulls in a residential neighborhood to act with reasonable care in requiring appropriate housing or storage of the two pit bulls outside the house?

 III. Did the Court of Special Appeals err in upholding the Circuit Court's refusal to sanction a party/defendant who refused to appear for a duly noted deposition and never sought a Protective Order when the knowledge of the defendant is essential to proving the elements of the tort claim against her?

 IV. Did the Court of Special Appeals err in upholding the Circuit Court's refusal to sanction defendant for spoilation of evidence where defendant landlord had taken photographs of the leased premises on the day of reletting the premises to the tenant owner of two pit bulls and later refused to produce those photographs in discovery?

 V. Did the Lower Courts err in refusing to admit forty-nine *Baltimore Sun* articles regarding pit bull attacks preceding the attack on Dominic?

We granted both the petition and cross petition. *Tracey v. Solesky*, 421 Md. 192, 25 A.3d 1025 (2011).

■ We answer appellant's first question in the affirmative and establish in this case, and prospectively, a strict liability standard in respect to the owning, harboring or control of pit bulls and cross-bred pit bulls in lieu of the traditional common law liability principles that were previously applicable to attacks by such dogs. We shall direct the Court of Special Appeals to reverse the trial court and send this case back to that court.[10] Because of our imposition of certain breed-specific strict liability standards in this case, it is unnecessary

---

10. The Court of Special Appeals reversed the trial court on regular negligence grounds and has directed that the case be retried. We do not agree that the evidence below supported that finding, but, with our

to address appellant's other questions. It is also unnecessary to address appellee/cross-petitioner's complaints as to the trial judge's failure to permit him to depose the landlord and to the trial judge's failure to allow him to introduce numerous newspaper articles all related to appellee's attempt to establish knowledge on the part of the landlord as to the aggressiveness and viciousness of Clifford.

■ We are modifying the Maryland common law of liability as it relates to attacks by pit bull and cross-bred pit bull dogs against humans. With the standard we establish today (which is to be applied in this case on remand), when an owner or a landlord is proven to have knowledge of the presence of a pit bull or cross-bred pit bull (as both the owner and landlord did in this case) or should have had such knowledge, a *prima facie* case is established. It is not necessary that the landlord (or the pit bull's owner) have actual knowledge that the specific pit bull involved is dangerous. Because of its aggressive and vicious nature and its capability to inflict serious and sometimes fatal injuries, pit bulls and cross-bred pit bulls are inherently dangerous.[11]

### The Old Common Law

In the early Maryland case of *Goode v. Martin*, 57 Md. 606, 609–612 (1882), which involved an attack by a Newfoundland dog and a "small terrier," [12] the Court stated certain infer-

holding that certain strict liability standards now apply, reversal is also required, albeit for a different reason.

**11.** We are, of course, aware that such dogs can, and sometimes do, become well mannered pets in respect to their own human families as pointed out in some of the briefs. The question, however, is not whether they are maiming or killing their owners or members of the owners' families (although sometimes they do), it is the degree to which they are attacking others, and the seriousness of the injuries caused, in comparison with the rate of dog attacks (and types of injuries) in respect to all breeds of dogs.

**12.** The type of terrier is not mentioned. We do note that next to a Newfoundland, terriers, including many pit bull terriers, would appear small by comparison.

ences that could then be made against *an owner* in a case such as the present case. There the Court first said: "In order to render the owner liable in damages to any one bitten by his dog, it must be proved not only that the dog was fierce, but that the owner had knowledge that he was fierce. To this effect are all the authorities. [citations omitted]." But later in its opinion, the Court stated:

> But we think the appellant is right in his contention that the defendant may be presumed to have knowledge that his dogs were fierce and dangerous, from the fact that he was accustomed to keep them tied during the day-time. In *Perry v. Jones*, 1 *Espinasse*, 452, Lord KENYON held from the fact that the owner kept his dog tied and did not permit him to run at large, it must be presumed that he had knowledge that the dog was vicious, unruly and not safe to be permitted to go abroad. . . . So, in the case now before us, we think the fact that the appellee kept his dogs tied during the day and let them loose at night, furnishes proof that he knew it would endanger his neighbors to permit them to be unfastened. . . . The evidence ought to be left to the jury as tending to prove the temper and vicious disposition of the dogs, and the knowledge of the appellees thereto, and it was therefore error in the Judge of the Circuit Court to take the case from the jury, and the judgment appealed from will be reversed and a new trial be awarded.[13]

*Martin*, 57 Md. at 611–12.

In *Bachman v. Clark, supra*, we stated the then common law standard in relation to dog attacks:

---

**13.** It is questionable whether this early modification to the old common law rule would have been applied by that Court had that era been subject to the population, traffic and congestion of modern-urban life and to the numerous statutes forbidding the running loose of dogs and the requirements that they be leashed or under control, such as is generally prevalent to some degree in many jurisdictions at the present time. We have previously noted that "The fact that the dogs here were kept in an enclosure in a suburban area in a day when legal restrictions frequently forbid a dog's running at large cannot have the same significance that the matter of enclosure had in 1916 and 1882." *McDonald v. Burgess*, 254 Md. 452, 458, 255 A.2d 299, 302 (1969)

At common law, the owner of a dog is not liable for injuries caused by it, unless it has a vicious propensity and notice of that fact is brought home to him. But when it is once established that the dog is of a vicious nature, and that the person owning or keeping it has knowledge of that fact, the same responsibility attaches to the owner to keep it from doing mischief as the keeper of an animal naturally ferocious would be subject to, and proof of negligence on the part of the owner is unnecessary. This is the recognized and well settled law of this state [citation omitted].

*Clark*, 128 Md. at 247, 97 A. at 441 (citation omitted).

This standard has been acknowledged and sometimes criticized in treatises, nonetheless, it has generally persisted. *See Harper, James and Gray on Torts*, Section 14.9, at 291 (3rd ed., 2007)

This rule has been criticized as to actual damage done by animals with known propensities therefore, such as attacks on birds and poultry by cats, but any such change in the law will most likely come from legislative enactment, *although there is no necessary reason to prevent courts from making such modifications without the aid of a statute* [emphasis added].

*Harper,* further comments that:

The common law has for many years made a distinction between animals ferae naturae and animals mansuetae natura, or between wild animals and domestic animals.

\* \* \*

It thus appears that one keeps dangerous animals at one's peril, that is, at strict liability, but otherwise as to animals 'not dangerous.' As to the former class, it is no defense that the keeper employed reasonable care, or even a high degree of diligence to prevent their escape. Liability is independent of any fault on the part of the owner.

\* \* \*

He may keep such animals, if he will, but if he has notice of their danger to human beings ..., he cannot keep them,

even carefully, at the risk of others. He has introduced an unusual danger into the community and he does so at his own risk.

*Id.* at Section 14.11.[14]

## Modifying the Common Law

In *Ireland v. State,* 310 Md. 328, 331–332, 529 A.2d 365, 365–366 (1987) we discussed the basic framework of the Court's role in establishing and modifying common law rules:

The determination of the nature of the common law as it existed in England in 1776, and as it then prevailed in Maryland either practically or potentially, and the determination of what part of the common law is consistent with the spirit of Maryland's Constitution and her political institutions, are to be made by this Court.

"Whether particular parts of the common law are applicable to our local circumstances and situation, and our general code of laws and jurisprudence, is a question that comes within the province of the Courts of Justice, and is to be decided by them. The common law, like our Acts of Assembly, are subject to control and modification of the Legislature, and may be abrogated, or changed as the

---

**14.** *Harper, supra,* Section 14–11, pg. 310, fn. 26 briefly discusses England's attempt to address the issue of breed-specific dangerous dogs:

"In England under the Animals Act 1971, section 2(2)(b) the dangerous propensities that must be known must be such as "are not normally found in animals of the same species." It has been held, on the basis of the statutory definition of "species" as including subspecies that "the relevant comparison was with other dogs of the same breed and not with other dogs generally." At about the same time, public reaction in England to injuries caused by dogs led to demands for the "banning of dangerous breeds such as pit bull terriers and Rottweilers." The Home Secretary announced plans to ban the "owning and breeding [of] pit bull terriers, Japanese tosas and other dogs bred for fighting" (but not Rottweilers), but the RSPCA and many veterinarians stated that they would refuse to participate in the mass slaughter of such dogs...."

The Home Secretary then compromised by requiring the "muzzling, neutering, and registering of 'fighting dogs,' said to include pit bull terriers, tosas, and bandogs (bandogs are dogs that are kept tied up as watchdogs or tied up because they are ferocious).

General Assembly may think most conducive to the general welfare; so that no great inconvenience, if any, can result from the power deposited with the judiciary to decide what the common law is, and its applicability to the circumstances of the State, and what has become obsolete from non-user or other cause. *State v. Buchanan,* 5 H. & J. 317, 365–66 (1821)."

Because of the inherent dynamism of the common law, we have consistently held that it is subject to judicial modification in the light of modern circumstances or increased knowledge. . . .

*Id.* at 331–332, 529 A.2d at 366.

More recently, in *Mayor & City Council of Baltimore, et al. v. Clark,* 404 Md. 13, 944 A.2d 1122 (2008) in a case involving the termination of a police official in Baltimore City we held that, "It is well settled that, where the General Assembly has announced public policy,[15] the Court will decline to enter the public policy debate, even when it is the common law that is at issue *and the Court certainly has the authority to change the common law* [italics added]." *Id.* at 38, 944 A.2d at 1135. *See also Price v. State,* 405 Md. 10, 32, 949 A.2d 619, 630 (2008) (". . . This Court has also characterized a jury's verdict of guilty, which is flatly inconsistent with the jury's verdict of not guilty on another count as "illogical" and "contrary to law." There is no reasonable basis for reversing the inconsistent verdict of "liability" but not reversing the inconsistent verdict of "guilty"); *Bozman v. Bozman,* 376 Md. 461, 830 A.2d 450 (2003) (". . . . We agree with the Court of Special Appeals, that the interspousal immunity doctrine is an antiquated rule of law which, in our view, runs counter to prevailing societal norms and therefore has lived out its usefulness. According, we shall answer the petitioner's first question in the affirmative and, so, complete the abrogation of the doctrine from the common

---

**15.** The parties have not directed our attention to any Maryland State statute addressing the matter of the dangerousness of pit bulls or to any action by the General Assembly declining to create different standards to be applied in respect to tort actions involving attacks by pit bulls. We know of none.

law of this State ..."). *And see Bowden v. Caldor, Inc. et al.,* 350 Md. 4, 27, 710 A.2d 267, 277 (1998):

> ... Consequently, the legal principles discussed below, applicable to judicial review of punitive damage awards for excessiveness, are set forth as principles of Maryland Common Law. Although some of these principles may be the same as requirements by other courts as a matter of constitutional law, we have no reason at this time to consider minimum constitutional requirements in this area. Moreover, some of the principles set forth below have a foundation in prior Maryland case law, whereas others do not. Nonetheless, as often pointed out, this Court has authority under the Maryland Constitution to change the Common law.

We recently spoke to the application of common law modifications in our case of *Polakoff, et al. v. Turner,* 385 Md. 467, 484, 869 A.2d 837, 850 (2005). There we said: "Generally, changes in the common law are applied prospectively, as well as to the case triggering the change in the common law." *See also Owens–Illinois, Inc. v. William Zenobia, Sr. et al.,* 325 Md. 420, 469–470, 601 A.2d 633, 657–658 (1992). There we said:

> We now turn to the matter of the effective date of our holdings with respect to punitive damages.
>
> Until today, under Maryland common law a plaintiff in a tort case was required to establish by a preponderance of the evidence those circumstances which would authorize the allowance of an award for punitive damages. By changing this standard of proof to clear and convincing evidence, we have not overruled any particular Maryland cases on the ground they were wrongly decided at the time. Instead we have exercised our constitutional authority to change the common law. [Citations omitted.]
>
> Recently, in *Julian v. Christopher, supra,* 320 Md. [1] at 10–11, 575 A.2d [735] at 739 [ (1990) ], we reiterated the principle that "[o]rdinarily decisions which change the common law apply prospectively, as well as to the litigants

before the court." Thus in *Boblitz v. Boblitz*,[16] we changed the common law by abrogating interspousal immunity in negligence cases and held that the change was applicable to the case then before the Court and to causes of action accruing after the date of our decision.

When, however, a change in the common law does not affect the elements of a cause of action[17] but relates to requirements at a trial, we have held that the change applies "to cases where the trials . . . commence after the date of our opinion in the present case."

Therefore, the "clear and convincing" standard of proof for punitive damages in tort cases applies to the instant case, . . . and to all trials commencing and trials in progress on or after the date this opinion is filed.

### Strict Liability Standards in Pit Bull Attack Cases

We began our modification of the old common-law rule with respect to dog attack cases with our strong dicta in *Matthews, supra*, highlighting the particular characteristics of pit bulls and cross-bred pit bulls. There we explained the difference between pit bulls and other breeds of dogs when we noted:

Thus, the foreseeability of harm in the present case was clear. The extreme dangerousness of this breed, as it has evolved today, is well recognized. 'Pit bulls as a breed are known to be extremely aggressive and have been bred as attack animals.' *Giaculli v. Bright*, 584 So.2d 187, 189 (Fla.App.1991). Indeed, it has been judicially noted that pit bull dogs 'bite to kill without signal' (*Starkey v. Township of Chester*, 628 F.Supp. 196, 197 (E.D.Pa.1986), are selectively bred to have powerful jaws, high insensitivity to pain,

---

16. 296 Md. 242, 275, 462 A.2d 506, 522 (1983).

17. In this case, we are modifying one of the elements that must be proven in cases involving pit bull attacks from knowledge that a particular dog is dangerous to knowledge that the particular dog involved is a pit bull. If it is a pit bull the danger is inherent in that particular breed of dog and the knowledge element of *scienter* is met by knowledge that the dog is of that breed.

extreme aggressiveness, a natural tendency to refuse to terminate an attack, and a greater propensity to bite humans than other breeds. The "Pit Bull's massive canine jaws can crush a victim with up to two thousand pounds (2,000) of pressure per square inch—three times that of a German Sheppard or Doberman Pinscher." *State v. Peters*, 534 So.2d 760, 764 (Fla.App.1988) *review denied*, 542 So.2d 1334 (Fla.1989). *See also Hearn v. City of Overland Park*, 244 Kan. 638, 650, 647, 722 [772] P.2d 758, 768, 765, *cert. denied* 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989) ("pit bull dogs represent a unique health hazard ... [possessing] both the capacity for extraordinarily savage behavior ... [a] capacity for uniquely vicious attacks ... coupled with an unpredictable nature" ... and that "of the 32 known human deaths in the United States due to dog attacks ... [in the period between July 1983 and April 1989], 23 were caused by attacks by pit bull dogs." Pit bull dogs have even been considered as weapons. *See State v. Livingston*, 420 N.W.2d 230 [223] (Minn.App.1998) (for the purpose of first degree murder); *People v. Garraway*, 187 A.D.2d 761, 589 N.Y.S.2d 942 (1992) (upholding conviction of pit bull's owner of criminal weapon in the third degree).

\* \* \*

.... And the Albuquerque Humane Society reported that no other breed of dog has "ever caused the kinds of injuries or exhibited the aggressive behavior shown by American Pit Bull Terriers ... [and the humane society does not] adopt out pit bull dogs because of their potential for attacks on other animals and people"); [some citations in this paragraph omitted].

*Matthews*, 351 Md. at 562–63 & n. 4, 719 A.2d at 127–128 & n. 4 (emphasis added).

However, we also stated in *Matthews* that:

.... Under the present circumstances, however, where a landlord retained control over the matter of animals in the tenant's apartment, coupled with the knowledge of past vicious behavior by the animal, *the extremely dangerous*

*nature of pit bull dogs,* and the foreseeability of harm to persons and property in the apartment complex, the jury was justified in finding that the landlord had a duty to the plaintiffs and that the duty was breached. The following principle set forth in *Prosser and Keeton on the Law of Torts,* Sec. 4 at 25 (5th ed.1984), is applicable here:

> 'The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with the compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts are known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive.'

*Id.* at 570, 719 A.2d at 131–132 (emphasis added).

Because the issue of strict liability was not expressly raised on appeal, we decided *Matthews* on regular common law negligence requirements. However, the language of that case clearly forecasted the direction the Court might take in the proper case. This is that case.

Soon after we decided *Matthews,* a "special report" was published in the Journal of the American Veterinary Medical Association noting that:

> From 1979 through 1996, dog attacks resulted in more than 300 dog-bite related fatalities in the United States. Most victims were children. Studies indicate, ... that pit bull-type dogs were involved in approximately a third of human ... [fatalities] during the 12 year period from 1981 through 1992 .... [18]

---

**18.** The figures also indicated that during a 12 year period ending in 1992, almost half of fatalities were caused by Rottweilers. More recent data indicates that currently more fatalities are caused by pit bulls than by Rottweilers. This may reflect the increasing popularity of pit bulls, i.e. more pit bulls—more attacks. Other issues such as training, use by persons in the illegal drug trade, etc., may also be causative factors.

*See,* 217 Journal of the American Veterinary Medical Association, no. 6, September 15, 2000, at 836. The report went on to state: "... the data indicates that Rottweilers and pit bull type dogs accounted for 67% of human DBRF ["dog bite related fatalities"] in the United States between 1979 and 1996". *Id.,* at 839. "It is extremely unlikely that they accounted for anywhere near 60% of dogs in the United States during that same period and, thus, there appears to be a breed-specific problem with fatalities." *Ibid.*[19]

An abstract from a recent article published in the *Annals of Surgery,* entitled *"Mortality, Mauling, and Maiming by Vicious Dogs "* which explored maiming and deaths due to dog attacks noted that:

Abstract

**OBJECTIVE:** Maiming and death due to dog bites are uncommon but preventable tragedies. We postulated that patients admitted to a level 1 trauma center with dog bites would have severe injuries and that the gravest injuries would be those caused by pit bulls.

**DESIGN:** We reviewed the medical records of patients admitted to our level 1 trauma center with dog bites during a 15–year period. We determined the demographic characteristics of the patients, their outcomes, and the breed and characteristics of the dogs causing the injuries.

**RESULTS:** Our Trauma and Emergency Surgery Services treated 228 patients with dog bite injuries; for 82 of those patients the breed of the dog involved was recorded (29 were injured by pit bulls)[29 out of 82]. Compared with attacks by other breeds of dogs, attacks by pit bulls were associated with a higher median injury Severity Scale score

19. The on-line publication *Animal People, www.animalpeoplenews.org,* estimates that pit bulls make up approximately 5% of the total dog population in the United States partly based upon surveys of for sale advertisements. The breed breakdowns at 62 animal shelters holding 5,236 dogs indicated that 23% of the dogs so held were pit bulls. These figures, if accurate, support an inference that pit bulls end up in animal shelters at a much larger ratio than their overall ratio within the total dog population.

(4 vs. 1; P=0.002), a higher risk of an admission Glasgow Coma Scale score of 8 or lower (17.2% vs. 0%; P=0.006), higher median hospital charges ($10,500 vs. $7200/ P=0.0003); and a higher risk of death (10.3% vs. 0%; P=0.041).

**CONCLUSIONS:** Attacks by pit bulls are associated with higher morbidity rates, higher hospital charges, and a higher risk of death than are attacks by other breeds of dogs. Strict regulation of pit bulls may substantially reduce the U.S. mortality rates related to dog bites.

John K. Bini et al., *Mortality, Mauling, and Maiming by Vicious Dogs,* 253 Annals of Surgery, no. 4, May 2011.

The Center for Disease Control, in at least one of its *"Morbidity and Mortality"* Weekly Reports (MMWR) has noted that:

From 1979 through 1994, attacks by dogs resulted in 279 deaths of humans in the United States ... (1, 2) Such attacks have prompted widespread review of existing local and state dangerous-dog laws, including proposals for adoption of breed-specific restrictions to prevent such episodes (3).

The "Editorial Note" following the Weekly Report noted that

during 1979–1996, fatal dog attacks occurred in 45 states. In 1986, nonfatal dog bites resulted in an estimated 585,000 injuries that required medical attention or restricted activity; in that year, dog bites ranked 12th among the leading causes of nonfatal injuries in the United States. In 1994, an estimated 4.7 million persons (1.8% of the U.S. population) sustained a dog bite, of these, approximately 800,000 (0.3%) sought medical care for the bite.

46 MMWR Weekly no. 21, *Dog–Bite Related Fatalities–United States 1995–1996,* May 30, 1997, pp. 463–466.

Although the Center for Disease Control did not recom-

mend breed-specific regulation [20] it did state: "... laws for regulating dangerous or vicious dogs should be promulgated and enforced vigorously."

Cases from other jurisdictions that address the inherent viciousness of pit bulls often involve the constitutionality of certain dog control regulations, or criminal cases where dog owners have been charged with using pit bulls as dangerous weapons. For example, in *City of Toledo v. Tellings*, 114 Ohio St.3d 278, 280–283, 871 N.E.2d 1152 (2007), the Ohio Supreme Court, reversing an intermediate appellate court, upheld most of Toledo's breed-specific regulations involving pit bulls. Tellings had challenged the constitutionality of that section of the statute that included pit bulls in the "vicious dog" category and stated that the "ownership, keeping, or harboring of a vicious dog" violated the regulations. Vicious dogs were defined in the statute to include pit bulls.

The Ohio court went on to state:

> The trial court cited the substantial evidence supporting its conclusion that pit bulls, compared to other breeds, cause a disproportionate amount of danger to people. The chief dog warden of Lucas County testified that (1) when pit bulls attack, they are more likely to inflict severe damage to their victim than other breeds of dogs, (2) pit bulls have killed more Ohioans than any other breed of dog, (3) Toledo police officers fire their weapons in the line of duty at pit bulls more often than they fire weapons at people and other breeds of dogs combined, (4) pit bulls are frequently shot during drug raids because pit bulls are encountered more frequently in drug raids than any other dog breed. The trial court also found that pit bulls are 'found largely in urban settings where there are crowded living conditions and a large number of children present,' which increases the risk of injury caused by pit bulls.

---

**20.** The Center did attach a chart of the breed-specific dog-attack fatalities it had recorded between 1979 and 1996. That chart showed that of the 279 fatal attacks in this country in that period, 79 were by pit bulls or pit bull crosses. Rottweilers accounted for 29 deaths.

The evidence presented in the trial court supports the conclusion that pit bulls pose a serious danger to the safety to citizens. The state and the city have a legitimate interest in protecting the citizens from the degree of danger posed by this breed of domestic dog.

*Tellings*, 871 N.E.2d at 1157 (emphasis added). *See also Bess v. Bracken County Fiscal Court*, 210 S.W.3d 177, 182 (Ky.App. 2006) ("Here, the determination by the Bracken County Fiscal Court that pit bull terriers have "inherently vicious and dangerous propensities" was certainly not unreasonable given the evidence in support of that finding.").

In *The Florida Bar v. Pape* and *The Florida Bar v. Chandler*, 918 So.2d 240, 242 and 245 (Fla.2005) cases, two Florida attorneys were disciplined for using an image of a pit bull in their advertising because it was misleading, and also portrayed an inappropriate message. Although the disciplinary case itself was unusual, relevant for our purposes here is the following statement by the Supreme Court of Florida:

In this case we impose discipline on two attorneys for their use of television advertising devices that violate the Rules of Professional Conduct. These devices, which invoke the breed of dog known as the pit bull, demean all lawyers and thereby harm both the legal profession and the public's trust and confidence in our system of justice.

\* \* \*

In addition, the image of a pit bull and the on-screen display of the words "PIT BULL" . . . are not relevant to the selection of an attorney. The referee found that the qualities of a pit bull as depicted by the logo are loyalty, persistence, tenacity, and aggressiveness. We consider this as a charitable set of associations that ignores the darker side of the qualities often also associated with pit bulls: malevolence, viciousness, and unpredictability. Further, although some may associate pit bulls with loyalty to their owners . . .

\* \* \*

Even the perception of loyalty may be unwarranted. In June, a twelve-year old boy was mauled to death in San Francisco by his family's two pit bulls.... That same month a Bay Area woman suffered severe injuries in an attack by her nine-year old pit bull.... A St. Louis man was killed in May by his two pit bulls that had "no apparent history of aggression and [were] described as well kept" [source citations in paragraph omitted.]

Pit bulls have a reputation for vicious behavior that is borne of experience.

*Id.*, at 241, 245 & n. 4.

Although the District of Columbia Court of Appeals found for the landlord on the basis that he had no right to terminate the lease in the case of *Campbell v. Noble,* 962 A.2d 264, 264–265 (D.C.App.2008), the Court described the magnitude of the injuries suffered by a boy hired to clean up dog waste from pit bulls:

.... The dogs then began to attack Elijah, biting him in the face and body. .... Elijah was raced to the hospital, where he underwent nine hours of surgery. Since the attack, Elijah has had physical and psychological difficulties. He had to relearn how to balance and walk, and has had terrible nightmares about the attack; he also no longer has a right ear. His left ear was surgically reattached.

*McNeely v. United States,* 874 A.2d 371 (D.C.App.2005), arose out of a vicious attack by two pit bulls. McNeely, the owner of the dogs, was criminally charged and convicted of two counts of violating the Pit Bull and Rottweiler Dangerous Dog Designation Emergency Act of 1996 (the "Pit Bull Act") that imposed certain requirements on a breed-specific basis relating to pit-bulls. McNeely challenged the statute on several grounds including "... that the Act constitutes an impermissible strict liability statute." *McNeely, supra,* at 375.

The facts of the attack are described as follows:

At approximately 1:00 a.m. on May 13, 1996, Helen Avery carried a bag of spoiled food to the trash can behind her home. As she replaced the can lid, Avery saw two dogs

appear from under the steps of her back porch. The dogs charged towards her, forcing Avery to seek an escape by scaling a fence to her neighbor's yard. Unfortunately, she did not evade the dogs quickly enough: one of them seized Avery by the back of her leg and pulled her off the fence, while the other dog jumped on top of her as she fell backwards. During the ensuing attack, skin, muscle, and nerve tissues were bitten off from various parts of her body, including her leg and both arms; one of her toes was nearly bitten off, and she lost a large amount of blood. The attack finally ended when Avery's son, Jerrel Bryant, and two other men successfully chased the dogs off by beating them with an ax and baseball bat.

In arguing that a denial of a motion to dismiss be upheld, the government stated that all that was required to be proven under the statute was that the owner knew the dog was a pit bull. The District of Columbia Court of Appeals agreed and upheld the conviction, and noted further, as related to the basic *scienter* requirement under the statute, that all that was required to be shown was that the pit bulls had attacked without provocation and the owner knew "that the dogs he owned were pit bulls." *Id.*

Multiple constitutional issues and other arguments were raised by pit bull advocates [21] in a challenge to a pit bull strict liability statute in the case of *The Colorado Dog Fanciers, Inc. et al. v. The City and County of Denver*, 820 P.2d 644

---

**21.** Some are similar to the arguments made in the appellant or *amicus'* briefs filed in the present case by supporters of pit bulls. In light of Maryland's situation, we find those particular arguments unpersuasive. We have fully reviewed and considered all the briefs.

We recognize the problems that exist when breed specific legislation is proposed—which is opposed by pit bull breeders, owners and fanciers. Such opposition has been present for many years. Our opinion in the present case does not ban pit bulls, but puts a greater responsibility for vicious dogs where pit bull advocates have long argued it should be—with the owners and others who have the power of control over such dogs. Our opinion imposes greater duties by reducing the standards necessary to hold owners and others liable for the attacks of their pit bulls.

(Colo.1991). The Supreme Court of Colorado in upholding the statute at issue, opined, in relevant part:

Since section 8–55 allows the determination that a dog is a pit bull based on nonscientific evidence, the dog owners assert that they are denied substantive due process. The city, however, is not required to meet its burden of proof with mathematical certainty of scientific evidence. Therefore, even though section 8–55 permits a finding of pit bull status to be based on expert opinion or on nonscientific evidence, such a procedure does not violate the dog owner's due process rights.

The dog owners also assert that the city ordinance treats all pit bulls and substantially similar dogs as inherently dangerous and is, therefore, unconstitutionally overbroad. This contention is without merit.

\* \* \*

The dog owners argue that the ordinance violates the Equal Protection Clause by creating an irrational distinction between one who owns a dog with the physical characteristics of a pit bull and one who owns a dog lacking those characteristics.

\* \* \*

. . . . The trial court found that pit bull attacks, unlike attacks by other dogs, occur more often, are more severe, and are more likely to result in fatalities. The trial court also found that pit bulls tend to be stronger than other dogs, often give no warning signals before attacking, and are less willing than other dogs to retreat from an attack, even when they are in considerable pain. Since ample evidence exists to establish a rational relationship between the city's classification of certain dogs as pit bulls, and since there is a legitimate governmental purpose in protecting the health and safety of the city's residents and dogs, the trial court correctly concluded that the ordinance did not violate the dog owner's right to equal protection of the laws.

*Id.*, at 649–652 (internal citations and footnotes omitted).

*Harper, supra,* notes that at least the following states have some form of state-strict liability statute in which the finding

of dangerousness of the particular attacking dog is not necessary to establish the elements of negligence: Arizona, Florida, Illinois, Iowa, New Jersey, Nebraska, Oklahoma, Connecticut, Wisconsin and Ohio. There are also indications in the literature that California, South Carolina and the District of Columbia also have some form of strict liability statute relating to dogs. Additionally, some of the cases and other authority we have examined concern local animal control laws, some of which are breed-specific.

The sources and discussions above, coupled with our extensive dicta in *Matthews, supra,* and the numerous instances of serious and often fatal attacks by pit bulls throughout the country, and especially in Maryland, persuades us that the common law needs to be changed in order that a strict liability standard be established in relation to attacks by pit bull and cross-bred pit bull mixes.[22]

### CONCLUSION

We hold that upon a plaintiff's sufficient proof that a dog involved in an attack is a pit bull or a pit bull mix, and that the owner, or other person(s) who has the right to control the pit bull's presence on the subject premises (including a landlord who has the right and/or opportunity to prohibit such dogs on leased premises as in this case) knows, or has reason to know, that the dog is a pit bull or cross-bred pit bull mix, that person is strictly liable for the damages caused to a plaintiff who is attacked by the dog on or from the owner's or lessor's premises.[23] This holding is prospective and applies to

---

22. Issues relating to the dangerousness of Rottweilers are not present in this case.

23. The appellee attempted to make the argument that the landlord had sufficient control over the alley behind the house such as to make the alley part of the landlord's and lessee's premises. He is incorrect. The language he asserts affords that right of control is the same as, or similar to, language contained in most deeds of conveyance in this state. It merely gives to the grantee whatever rights the grantor had in the alley. In the case of alleys improved, maintained or accepted by public entities, the primary right that language gives to an adjacent

this case and causes of action accruing after the date of the filing of this opinion. Upon remand to the trial court, it shall apply in this case the modifications to the common law herein created.[24]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED FOR THE REASONS HEREIN STATED; THAT COURT IS DIRECTED TO REMAND THE CASE TO THE TRIAL COURT FOR A RETRIAL CONSISTENT WITH THE NEW COMMON LAW PRINCIPLES HEREIN ADOPTED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE APPELLANT.**

HARRELL, GREENE, and BARBERA, JJ., dissent.

GREENE, J., dissenting, in which HARRELL and BARBERA, JJ., join.

I respectfully dissent:

Today, the majority holds that a pit bull or any dog with a trace of pit bull ancestry (determined by what means the majority opinion leaves us entirely in the dark)[25] shall be

landowner is to be able to make a claim to the center of the roadway if the public body ever closes the alley or sufficiently abandons it. Until that time, adjacent landowners have ingress and egress rights along with the general public. Generally, they do not have the right to control the public way. As we are holding that liability follows a pit bull when it leaves its abode to launch an attack, control of the alley is not an issue. In this case, it is clear that the pit bull twice left its enclosure on the lessee's/landlord's property to attack two boys. Accordingly, the pit bull attacked the two boys *from* the subject property.

If the owner had taken the pit bull to the supermarket or on a day trip to the beach in Ocean City, and while there, the pit bull attacked someone, the attack would not have been on or *'from'* the leased premises. While the owner's responsibility remains clear, liability, if any, on the part of the landlord in such a situation seems much more remote.

**24.** The trial court correctly applied the principles of the common law at the time the case was first tried below.

**25.** The majority opinion delivers an unenlightening and unworkable rule regarding mixed-breed dogs. How much "pit bull" must there be

deemed hence forth vicious and inherently dangerous as a matter of law. Thus, an owner, keeper, or landlord with control over a tenant's premises can be held strictly liable for harm a pit bull or mixed-breed pit bull[26] causes to third parties. According to the majority:

> [W]e are modifying one of the elements that must be proven in cases involving pit bull attacks from knowledge that a particular dog is dangerous to knowledge that the particular dog involved is a pit bull. If it is a pit bull the danger is inherent in that particular breed of dog and the knowledge element of *scienter* is met by knowledge that the dog is of that breed.

Maj. op. at 642 n. 17, 50 A.3d at 1083 n. 17.

Now, it appears, the issue of whether a dog is harmless, or the owner or landlord has any reason to know that the dog is dangerous, is irrelevant to the standard of strict liability. In the words of the majority, the owner or landlord will be held strictly liable for any harm the dog causes if the owner or landlord had "knowledge of the presence of a pit bull or cross-bred pit bull ... or [the owner or landlord] should have had such knowledge[.]" Maj. op. at 636, 50 A.3d at 1079. By virtue of this new rule, grounded ultimately upon perceptions of a majority of this Court about a *particular breed* of dog, rather than upon adjudicated facts showing that the responsible party possessed the requisite knowledge of the animal's inclination to do harm, the majority transforms a clear factual question into a legal one in an effort to create liability. If the majority believes that it has not transformed the relevant

---

in a dog to bring it within the strict liability edict? How will that be determined? What rationale exists for any particular percentage of the genetic code to trigger strict liability?

**26.** Mixed-breed pit bulls are dogs "with heritages including any percentage of recognized pit-bull breeds[.]" Kristen E. Swann, Note, *Irrationality Unleashed: The Pitfalls of Breed–Specific Legislation*, 78 UMKC L.Rev. 839, 853 (2010). To the extent that the majority discusses "cross-bred" pit bulls, we note that, for purposes of the issues considered herein, the term "cross-bred" will be treated the same as "mixed-breed" in the context of this discussion.

inquiry from a factual determination into a legal one, in the present case, then I pose this question: What expert testimony or factual predicate is contained within this record to support a factual finding that pit bulls and mixed-breed pit bulls are inherently dangerous? I have considered the record and found no such factual predicate. Further, if the majority believes it is taking judicial notice of such facts—why, pray tell, is an appellate court willing to take judicial notice of facts about the breed of particular dogs, and characteristics allegedly associated with that breed, when the trial judge was not willing to do so? Moreover, and more problematically, why should appellate courts even consider taking judicial notice of facts relating to dog bite statistics that are clearly in dispute?

Indeed, the injuries to the plaintiff are unfortunate and warrant someone taking responsibility for the harm caused to him. In the absence of sufficient facts[27] to establish a *prima facie* case of liability, however, the majority only compounds the problem created, driven by its apparent desire to reach a particular result in this case. Succumbing to the allure of bad facts leads inevitably to the development of bad law. On this record, clearly, there is evidence of injury to the plaintiff. There is also sufficient evidence that the owner knew or

---

**27.** In their cross-petition for writ of certiorari, Respondents challenge the decision made by the trial court concerning a discovery dispute. According to Respondents, they were precluded from discovering facts necessary to establish the elements of their case against the landlord. Mrs. Dorothy M. Tracey, the 89-year-old landlord, did not appear for her scheduled pretrial deposition. According to a letter from her family physician, Mrs. Tracey could not attend the deposition or participate in court proceedings due to her poor health, which included cardiac problems associated with undue stress. Pursuant to Maryland Rule 2-433(a), and notwithstanding the doctor's note, the hearing judge exercised his discretion in issuing a ruling that precluded Respondents from taking her deposition and also precluded Mrs. Tracey from testifying at trial on her own behalf. There were a variety of alternative means of discovery open to Respondents that they failed to utilize, including, *inter alia*, written interrogatories, depositions upon written request, and requests for admissions of fact. In addition, Respondents failed to establish that the hearing judge abused his discretion. Thus, there is no good reason for this Court to reverse the trial judge's ruling on the discovery issue or his refusal to enter a default judgment against the landlord.

should have known of Clifford's vicious propensities. There is insufficient evidence, however, to establish liability on behalf of the landlord. The majority even acknowledges that, in the present case, the trial judge was correct in granting judgment for the landlord on the grounds that "the evidence was insufficient to permit the issue of common law negligence to be presented to the jury." Maj. op. at 633, 50 A.3d at 1078. Furthermore, evaluating the facts under the common law as it existed prior to this opinion, there is no evidence in the record that the landlord knew that the dog in question had vicious propensities or that the landlord should have known that this dog would likely attack people in the manner the plaintiff was attacked. Thus, taking into account the common law as it existed at the time of trial, there is no basis for finding the landlord liable under a theory of strict liability.

One author has described the common law standard of strict liability in dog bite cases in the following way:

> For centuries, dogs have been known as a companion to man[kind]. As such, they were considered harmless; and if they did, in fact, possess dangerous characteristics, it was considered abnormal. Consequently, the owner of a dog was not strictly liable for a dog bite, unless he had reason to know the dog was abnormally dangerous. Being abnormally dangerous was often characterized as having a tendency to attack human beings, whether the attack was in anger or in play. The owner's liability was in keeping a dog after gaining knowledge of its propensity for abnormally vicious behavior. Thus, the requirement of scienter was a hurdle plaintiffs needed to overcome in order to proceed with a lawsuit. (Footnotes omitted.)

Lynn A. Epstein, *There Are No Bad Dogs, Only Bad Owners: Replacing Strict Liability with a Negligence Standard in Dog Bite Cases,* 13 Animal L. 129, 132 (2006). Believing that the traditional common law principles of strict liability applicable to dog bite cases are inadequate, the majority modifies the common law. In the present case, the Court of Special Appeals reversed the trial court and remanded the case for a new trial, and the majority affirms that judgment, but for a

different reason than that given by our brethren on the intermediate appellate court. According to the majority, if on remand the plaintiff can prove that the owner or landlord had knowledge of Clifford's presence on the leased premises and that Clifford is a "pit bull or cross-bred pit bull," or if the plaintiff can prove that the owner or landlord should have had such knowledge, the plaintiff will have established a *prima facie* case of strict liability for any harm caused. *See* Maj. op. at 636, 50 A.3d at 1079–80.

Until today, the common law in Maryland was that the owner or keeper of a dog or other domestic animal would be held strictly liable for injuries caused by that animal, provided the plaintiff could show that the owner or keeper "had knowledge of [the animal's] disposition to commit such injury[.]" *Twigg v. Ryland*, 62 Md. 380, 385 (1884) (noting that "[t]he gist of the [strict liability] action is the keeping [of] the animal after knowledge of its mischievous propensities"). Likewise, until today, a landlord would be held liable to a third party for an attack by a tenant's animal where the landlord had knowledge of the animal's presence on the leased premises and knowledge of its vicious propensities, and the landlord maintained control over the leased premises. *Matthews v. Amberwood Assocs. Ltd. P'ship, Inc.*, 351 Md. 544, 570, 719 A.2d 119, 131–32 (1998); *see Shields v. Wagman*, 350 Md. 666, 690, 714 A.2d 881, 892–93 (1998). *Scienter*, or knowledge, is defined as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp. as a ground for civil damages or criminal punishment." *Black's Law Dictionary* 1373 (8th ed.2004). Under Maryland law, "the owner's [strict] liability arises from exposing the community to a known dangerous beast rather than any negligence in keeping or controlling his animal." *Slack v. Villari*, 59 Md.App. 462, 473, 476 A.2d 227, 232 (1984) (citing William L. Prosser, *Handbook of the Law of Torts* § 76, at 499 (4th ed.1971)). The burden is on the plaintiff to establish "that the owner [or keeper of the animal] knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or

propensity of the animal to do the particular mischief that was the cause of the harm." *Herbert v. Ziegler,* 216 Md. 212, 216, 139 A.2d 699, 702 (1958) (citations omitted). If the plaintiff fails to show the owner or keeper's *scienter,* or knowledge, of the animal's propensity to cause the very harm inflicted, recovery for the harm caused by the animal will be denied. *See Twigg,* 62 Md. at 386.

With regard to this theory of strict liability, the mere fact that a dog is kept in an enclosure or is otherwise restrained is not sufficient to show the owner or keeper's knowledge of the animal's vicious propensities or inclination to bite people. *McDonald v. Burgess,* 254 Md. 452, 458, 255 A.2d 299, 302 (1969); *see Ward v. Hartley,* 168 Md.App. 209, 218, 895 A.2d 1111, 1116 (2006), *cert. denied,* 394 Md. 310, 905 A.2d 844 (2006). Furthermore, in accordance with the well-settled common law standard of strict liability, the breed of the dog, standing alone, has never been considered a sufficient substitute for proof that a *particular* dog was dangerous or had a violent nature. *See McDonald,* 254 Md. at 460, 255 A.2d at 303; *Slack,* 59 Md.App. at 476, 476 A.2d at 234. Specifically, in *McDonald,* we held that the mere fact that the dog in question belonged to a specific breed, which "can and often does behave in a very vicious manner," was insufficient to hold the owner legally responsible for his German shepherd attacking another person. *McDonald,* 254 Md. at 460–61, 255 A.2d at 303. In that case, "[t]here [wa]s nothing in the record to demonstrate that the particular dog alleged to have caused the injury . . . was of a violent or oppressive nature" and that the defendant had the requisite *scienter. Id.* Thus, in order to hold the owner or keeper of a dog strictly liable, there must be a showing that the *particular* dog, in that case a German shepherd, was of a violent nature and that the owner or keeper of the dog knew, or by the exercise of ordinary care should have known, of the dog's inclination or propensity to do the particular mischief that was the cause of the harm. *McDonald,* 254 Md. at 456–60, 255 A.2d at 301–03.

Furthermore, until today, this Court has never announced a theory of strict liability predicated upon the alleged knowledge

of the owner, keeper, or landlord of the premises, based upon assumptions about a particular breed of an animal, where a dog of that breed caused an injury to another human being. Ordinarily, the owner, keeper, or landlord of the premises, would be strictly liable in a dog bite case where the responsible party was in a position to anticipate the harm; primarily, because he or she had sufficient knowledge of the dog's vicious propensities or inclination and would thereby be in a position to take corrective action. *See Bachman v. Clark,* 128 Md. 245, 248, 97 A. 440, 441 (1916). Under the new rule announced today, however, the only corrective action an owner, keeper, or landlord could possibly take to avoid liability for the harm caused to another by a pit bull or mixed-breed pit bull is not to possess or allow possession of this specific breed of dog on the premises. Conversely, any other breed of dog in the possession of the owner or on premises controlled by the landlord, no matter how violent, apparently, would be judged by a different standard. As a result of the majority opinion, it is unclear as to what standard should be applied prospectively to owners and landlords for the liability of other breeds of dogs kept on the premises.

Although this Court has authority to alter the common law, we have been reluctant to do so because of the principle of *stare decisis,* which we have confirmed "promotes the even-handed, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *DRD Pool Serv., Inc. v. Freed,* 416 Md. 46, 63, 5 A.3d 45, 55 (2010) (quoting *Livesay v. Balt. Cnty.,* 384 Md. 1, 14, 862 A.2d 33, 40–41 (2004)). We have changed or modified the common law when the prior decision was "clearly wrong and contrary to established principles[,]" *State v. Adams,* 406 Md. 240, 259, 958 A.2d 295, 307 (2008) (quotation omitted), *cert. denied,* 556 U.S. 1133, 129 S.Ct. 1624, 173 L.Ed.2d 1005 (2009), or when precedent has been superseded by significant changes in the law or facts. *Harrison v. Montgomery Cnty. Bd. of Educ.,* 295 Md. 442, 459, 456 A.2d 894, 903 (1983) (allowing departure from *stare decisis* when there are "changed conditions or

increased knowledge, [such] that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people").

Consistent with our precedent, there is no good reason to modify the common law in this case. Modern circumstances and knowledge gleaned from the literature regarding "pit bulls" have not substantially changed since 1998 when we decided *Matthews* and *Shields*. The majority relies upon a *Report* issued after our decisions in *Matthews* and *Shields* that is published in the Journal of the American Veterinary Medical Association and indicates that "pit bull-type dogs were involved in approximately a third of human ... [fatalities] reported during the [twelve]-year period from 1981 through 1992[.]" *See* Jeffrey J. Sacks et al., *Breeds of Dogs Involved in Fatal Human Attacks in the United States Between 1979 and 1998*, 217 J. Am. Veterinary Med. Ass'n 836, 836 (2000) [hereinafter *Veterinary Medical Association Report*]. This information was certainly available prior to publication of the *Veterinary Medical Association Report*. The Report does not recommend strict liability as a potential solution to the problem of attacks by pit bull dogs. *See Veterinary Medical Association Report, supra,* at 839–40. In fact, the *Report* questions the success of breed-specific liability requirements and urges the consideration of factors completely unrelated to the breed or appearance of dogs, including their socialization, training, size, sex, and reproductive status. *See id.* The *Veterinary Medical Association Report* warns that dog bite data can be misleading. *See Veterinary Medical Association Report, supra,* at 838. Moreover, other reports question the use of dog bite statistics and emphasize that such statistics do not provide an accurate portrayal of dogs that bite. *See* Stephen Collier, *Breed–Specific Legislation and the Pit Bull Terrier: Are the Laws Justified?*, 1 J. Veterinary Behavior 17, 18 (2006); Bonnie V. Beaver et al., *A Community Approach to Dog Bite Prevention*, 218 J. Am. Veterinary Med. Ass'n 1732, 1733 (2001).

Public knowledge and the hysteria regarding pit bulls is no more prevalent now than it was in 1998 when *Matthews* and

*Shields* were decided. *See* Collier, *supra*, at 17–18 (discussing a trend in several countries, including the United States, of the media portraying the pit bull breed with "lurid and sensational accounts of its background, capabilities, and character" and the lasting effects of that depiction). A 2011 Report entitled *Mortality, Mauling, and Maiming by Vicious Dogs*, cited by the majority, notes that "[s]trict regulation of pit bulls may substantially reduce the U.S. mortality rates related to dog bites." John K. Bini et al., *Mortality, Mauling, and Maiming by Vicious Dogs*, 253 Annals Surg. 791, 791 (2011). The author recommends regulation, however; he does not specifically suggest imposing strict liability in tort. Bini et al., *supra*, at 796. Furthermore, strict regulation does not equate to strict liability in tort. In the field of regulation, for example, the direct focus is on the owner's behavior, sterilization, socialization, supervision, breeding practices, educational outreach to potential dog owners, and screening of potential owners. *See* Jamey Medlin, *Pit Bull Bans and the Human Factors Affecting Canine Behavior*, Comment, 56 DePaul L.Rev. 1285, 1304–1318 (2007) (suggesting laws designed to target human behavior related to treatment of dogs, including sterilization, breeder licensing programs, screening programs, and community outreach). With regard to dog bite statistical information, some experts express doubt that it is even possible to calculate dog bite rates for a particular breed of dog or to compare rates between breeds because many dogs are unregistered or unlicensed. *See* Safia Gray Hussain, *Attacking the Dog Bite Epidemic: Why Breed–Specific Legislation Won't Solve the Dangerous–Dog Dilemma*, Note, 74 Fordham L.Rev. 2847, 2870–71 (2006) (referencing Beaver et al., *supra*, at 1733).

According to some experts, there are more than twenty-five breeds of dogs commonly mistaken for pit bulls. Hussain, *supra*, at 2870. Notwithstanding this empirical evidence, the majority relies upon the assumption that all pit bulls are inherently dangerous. In this record, there is no evidence from expert witnesses to support the proposition that pit bulls or pit bull mixed-breeds are inherently dangerous. It appears

that the media has demonized pit bulls as gruesome fighting dogs and has not revealed the long history of pit bulls as family dogs with passive behaviors. *See* Medlin, *supra*, at 1288–1290 (discussing the role of pit bulls as family pets in the early twentieth century in contrast to public perception today); Lynn Ready, *Pit–Bull Terrier Therapy Dogs Provide Great Service to Their Community*, Best Friends Animal Society Pit Bull Terrier Initiatives (Apr. 28, 2011), http://network. bestfriends.org/initiatives/pitbulls/17100/news.aspx. The majority also assumes that breed-specific rules, as opposed to behavior modification rules, are a better approach to controlling the problem of dog bites caused by pit bulls and mixed-breed pit bulls that attack humans. Again, the empirical evidence is in dispute. Some experts conclude that breed-specific liability rules provide a superficial sense of security because many factors completely unrelated to the breed or appearance of dogs affect their tendency toward aggression, including early experience, socialization, training, size, sex, and reproductive status. *See* Sacks et al., *supra*, at 839–40.

In those states referenced by the majority as examples of jurisdictions where the strict liability standard has been applied in the manner the majority announces today, it was clearly the legislatures of those states that enacted specific legislation to address the problem of harm caused by pit bulls and mixed-breed pit bulls. For example, the majority relies upon *City of Toledo v. Tellings,* in which the Supreme Court of Ohio upheld Toledo's breed-specific legislation with regard to "pit bulls." *Tellings,* 114 Ohio St.3d 278, 871 N.E.2d 1152, 1159 (2007) (holding that "the state of Ohio and the city of Toledo have a legitimate interest in protecting citizens from the dangers associated with pit bulls, and that R.C. 955.11(A)(4)(a)(iii) and 955.22 and Toledo Municipal Code 505.14 are rationally related to that interest and are constitutional"). Likewise, in Colorado, the District of Columbia, Florida, and Kentucky, strict liability statutes addressing liability for injuries caused by dogs were enacted by the respective state legislatures. Rebecca F. Wisch, *Quick Overview of Dog Bite Strict Liability Statutes,* Michigan State University

College of Law Animal Legal & Historical Center (May 2006, updated 2010), http://www.animallaw.info/articles/qvusdogbites lstatutes.htm. In each of those jurisdictions, the courts have followed the lead of state legislatures rather than legislating from the bench. *See, e.g., Colo. Dog Fanciers, Inc. v. City & Cnty. of Denver,* 820 P.2d 644, 646 (Colo.1991) (evaluating the constitutionality of the " 'Pit Bulls Prohibited' ordinance"); *McNeely v. United States,* 874 A.2d 371, 380 (D.C.2005) (concluding that "the Pit Bull Act is sufficiently definite to comport with the demands of the Constitution's Due Process Clause and that the Council [of the District of Columbia] created through the Act a constitutional strict liability felony, without requiring a culpable state of mind, so long as it is proved that the defendant knew he or she owned a pit bull"); *State v. Peters,* 534 So.2d 760, 761–62 (Fla.Dist.Ct.App.1988) (upholding a local ordinance regulating the ownership of pit bulls); *Bess v. Bracken Cnty. Fiscal Ct.,* 210 S.W.3d 177, 179–80 (Ky.Ct.App.2006) (recognizing the "right of state legislatures to exercise their police power to regulate dog ownership" and upholding a local county ordinance banning possession of pit bull terriers).

Given the nature of the extensive social problem of regulating pit bulls and mixed-breed pit bulls, the majority elects to focus on the breed of the dog involved, rather than on the behavior of the dog, the owner, and the landlord. The issues raised involving breed-specific regulation are not appropriate for judicial resolution; rather, those issues are best resolved by the Maryland General Assembly, as that branch of government is better equipped to address the various issues associated with regulation of pit bulls and mixed-breed pit bulls. For example, some experts indicate that the term "pit bull" does not describe any one particular breed of dog; instead, it is a generic category encompassing the American Staffordshire Terrier, the Staffordshire Bull Terrier, and the American Pit Bull Terrier. *See* Hussain, *supra,* at 2851–52. Neither the American Kennel Club nor the United Kennel Club recognizes all three breeds, and the breed descriptions and standards provided by the two organizations differ. *Id.* It is difficult for

courts, therefore, both to determine whether a particular dog should be categorized as a pit bull and to differentiate between pit bulls and other breeds. Hussain, *supra,* at 2852; Karyn Grey, *Breed–Specific Legislation Revisited: Canine Racism or the Answer to Florida's Dog Control Problems?,* Comment, 27 Nova L.Rev. 415, 432 (2003) (positing that "the evidentiary method for determining when a dog is a pit bull or pit bull mix can be confusing and difficult"). In addition, the connection between a dog's appearance and the actual breed is tenuous, according to some experts. *See* Victoria L. Voith, *Shelter Medicine: A Comparison of Visual and DNA Identification of Breeds of Dogs,* Proceedings of Annual AVMA Convention (July 11–14, 2009), http://www.nathanwinograd.com/linked/misbreed.pdf (finding that there is discrepancy between breed determination based on physical attributes and scientific determinations). Taking into consideration the lack of evidence in the record of this case with regard to the landlord's knowledge of the vicious propensities of the dog, the conflicting studies about how best to control the dog bite "epidemic" mentioned herein, and the problems inherent in defining what constitutes a "mixed-breed" pit bull, the matter of creating a new standard of liability is fraught with problems and is beyond the sphere of resolution by any appellate court.

Judges HARRELL and BARBERA have authorized me to state that they join in the views expressed in this dissenting opinion.

## ON MOTION FOR RECONSIDERATION

Opinion by WILNER, J., which ADKINS, J., joins.

On April 26, 2012, the Court filed an Opinion in this case holding, by a four-to-three vote, that, "upon a plaintiff's sufficient proof that a dog involved in an attack is a pit bull **or a pit bull mix,** and that the owner, or other person(s) who has the right to control the pit bull's presence on the subject premises (including a landlord who has the right and/or opportunity to prohibit such dogs on leased premises as in this case) knows, or has reason to know, that the dog is a pit bull **or**

**cross-bred pit bull mix,** that person is strictly liable for the damages caused to a plaintiff who is attacked by the dog on or from the owner's or lessor's premises" (bolding added). Notwithstanding a dissent by Judge Greene, joined in by Judges Harrell and Barbera, I joined the majority Opinion, authored by Judge Cathell.

On May 25, 2012, the petitioner, Dorothy Tracey filed a motion for reconsideration, complaining that the imposition of a "new duty" on landlords was fundamentally unfair and unconstitutional as applied to her. An answer to the motion was filed by the respondents. As to the Court's holding with respect to pit bulls, I would deny the motion. For the reasons stated in Judge Cathell's Opinion, I do not believe that a "new duty" was created or that there is anything unconstitutional or unfair about holding Ms. Tracey liable for the gruesome damage done to Dominic Solesky by a pit bull that she knowingly, and with obvious reservations, allowed her tenant to keep on her property.

The Opinion is not as dramatic and pervasive as the motion claims. It does not prohibit the ownership or breeding of pit bulls; it does not require that persons who own such dogs get rid of them. By imposing long-standing principles of common law strict liability for what is now clearly foreseeable damage done by those dogs, it simply requires that those who possess them or permit them to be on their property take reasonable steps to assure that they do not run loose or otherwise are in a position to injure other people.

That said, having re-read the briefs, relevant portions of the record extract, and the dissent, I am now convinced that, on the record before us, the application of the Court's holding of strict liability to cross-bred pit bulls was both gratuitous and erroneous. I would grant the motion for reconsideration, in part, to delete any reference to cross-bred pit bulls (*i.e.,* part pit bull and part some other breed of domestic dog), so that the Court's holding would apply only to pit bulls that are not cross-breds. There are two reasons for my change in position. First, there was never any assertion, suggestion, or finding in

this case that the dog was a cross-bred—was anything other than a pit bull. Second, it is not at all clear what "cross-bred" really means—whether it is limited to the offspring of two pure-bred dogs of different breed, so that the offspring is, in effect, half of one and half of the other, or includes succeeding generations bred from cross-bred parents.

The complaint filed in the Circuit Court alleged that the dog that mauled young Dominic was a "pit bull terrier." The lease allowed the tenant to keep "2 pit bull dogs." Although Ms. Tracey's answer to the complaint is not in the record extract, it does not appear that she ever contested that the dog was a pit bull terrier or asserted that it was a cross-bred. The case proceeded on the premise that dog was a pit bull terrier and not a cross-bred. Unlike.the situation in *Ward v. Hartley*, 168 Md.App. 209, 220, 895 A.2d 1111 (2006), there was not even a suggestion that the dog *might* be a cross-bred. The acknowledgment that the dog was a "pit bull" or "pit bull terrier" remained at the appellate level. Throughout Ms. Tracey's brief, the dog is referred to as a pit bull. The prior cases cited in the majority Opinion all involved pit bulls. There is no suggestion in any of them (except a brief reference in *Ward v. Hartley* ) that the dog in question was or might have been a cross-bred.

In short, the question of whether strict liability should apply to cross-breds was never in the case—was never asserted or argued. By gratuitously including them, the Court has opined on an issue that was never raised or argued.

Because the cross-bred issue was never raised, there is no discussion about what the term includes. It appears that some dog-breeding organizations treat cross-breds as synonymous with hybrids.[1] Some recognize as a cross-bred, or a hybrid, only the offspring of pure-bred parents. Others, while claiming that the intended benefits of crossbreeding accrue

---

1. Lexicographers also regard "cross-breed" or "cross-bred" and "hybrid" as synonymous. *See Roget's International Thesaurus* (3rd. Ed.), §§ 44.14 and 44.16; also Merriam–Webster's Collegiate Dictionary (11th ed.), p. 298.

only to the first generation, acknowledge what is a matter of common knowledge anyway—that it is not uncommon for cross-breds to mate with pure-breds or with other cross-breds, creating dogs that may have elements of several breeds in varying proportions. In imposing strict liability for cross-breds, some greater certainty is required. Is it intended that a dog be classified as a cross-bred pit bull if only one of its grandparents (or great-grandparents, or great-great grandparents) was a pure-bred pit bull? [2]

A motion for reconsideration gives each judge of the Court an opportunity to take another look at the issue and to rethink the position formerly asserted. Because of the care that each judge, individually and collaboratively with his or her colleagues, takes before reaching a conclusion, it is rare that a motion for reconsideration will be found persuasive, and so they are rarely granted. On reflection, however, I am now convinced that the majority (of which I was a part) erred in gratuitously applying strict liability to cross-breds, when that issue was never in the case, and, through this opinion on the motion for reconsideration, I disassociate myself with that aspect of the majority Opinion. Any extension of strict liability to cross-breds (or to any other breed of dog), other than by legislative action, should await a case in which that issue is fairly raised

I am authorized to state that Judges HARRELL, GREENE, ADKINS, and BARBERA join in this Opinion on reconsideration, with the caveat that Judges HARRELL, GREENE, and BARBERA maintain their dissent to the

---

**2.** I would note that the General Assembly has itself wandered into that thicket. Maryland Code, § 10–621(b) of the Criminal Law Article, makes it a criminal offense to possess a "hybrid" of a member of the dog family [other than a domestic dog] and a domestic dog. There is not statutory definition of "hybrid," however, leaving open the prospect that one who possesses an animal that is one-sixteenth wolf or coyote and fifteen-sixteenth poodle would be subject to criminal penalties. Perhaps the Legislature acted on evidence that such an animal was sufficiently dangerous to make its mere possession criminal. Evidence of that kind regarding cross-bred pit bulls is not in this record, howev-

**668**

extension of strict liability to the owners of pit bulls and to the owners of property who permit tenants to keep pit bulls on their property. Chief Judge BELL and Judge CATHELL would deny the motion for reconsideration.

## ON MOTION FOR RECONSIDERATION

### ORDER

For the reasons stated in Judge Wilner's Opinion on Reconsideration, it is, by the Court of Appeals of Maryland this 21st day of August 2012, ORDERED:

1. That the motion for reconsideration is granted in part and denied in part; and

2. That the Opinions filed April 26, 2012 are amended to delete any reference to cross-breds, pit bull mix, or cross-bred pit bull mix.

er, so there is no reason for us, at this point, to follow the legislative lead.