*Mary Paone Latz v. Jacob Parr*, No. 977, September Term, 2019. Opinion by Kenney, J.

**ANIMALS – INJURIES TO PERSONS – DUTIES AND LIABILITIES IN GENERAL**

Prior to April 1, 2012, recovery for injuries caused by a dog could be pursued under theories of both negligence and strict liability. As this Court explained in *Slack v. Villari*, 59 Md. App. 462, 470 (1984), "negligence that exposes an animal owner who is unaware of the animal's dangerous propensities" is the "failure to control the [dog] or prevent the harm caused by it." *See also Moura v. Randall*, 119 Md. App. 632, 644 (1998).

**NEGLIGENCE – BREACH OF DUTY – VIOLATIONS OF STATUTES AND OTHER REGULATIONS**

This Court has looked to animal control statutes in determining whether a particular defendant's violative conduct was evidence of negligence. *See, e.g., Moura v. Randall*, 119 Md. App. 632, 647 (1998) (considering whether the defendant violated Montgomery County Code 5-26, which prohibited an owner from permitting a dog to "run at large"); *Hammond v. Robins*, 60 Md. App. 430, 437 (1984) ("appellant violated the Carroll County Animal Ordinance by not keeping the dog under restraint and by allowing the dog to leave the property unattended and unrestrained").

**STATUTES – CONSTRUCTION – IN GENERAL – RULES, PRINCIPLES, MAXIMS, AND CANONS OF CONSTRUCTION IN GENERAL**

We interpret local ordinances, such as the Howard County Code, "under the same canons of construction that apply to the interpretation of [state] statutes." *Kane v. Bd. of Appeals of Prince George's Cnty.*, 390 Md. 145, 161 (2005) (quoting *O'Connor v. Balt. Cnty.*, 382 Md. 102, 113 (2004)). And, with few exceptions, Maryland County animal control ordinances include within the definition of "owner" those who harbor, keep, or possess an animal.

**STATUTES – CONSTRUCTION – IN GENERAL – PURPOSE – POLICY BEHIND OR SUPPORTING STATUTE**

Md. Code Ann. (1973, 2013 Repl. Vol., 2019 Supp.), Cts. & Jud. Proc. Article ("CJP") § 3-1901 and animal control provisions of county codes reflect similar purposes. "Animal control statutes are designed to protect the public against the hazards of personal injury or property damage caused by roaming animals, dogs in this instance." *Hammond v. Robins*, 60 Md. App. 430, 435–36 (1984). And in enacting CJP § 3-1901, the General Assembly explained that "this Act is an emergency measure, is necessary for the immediate preservation of the public health or safety."

**STATUTES – CONSTRUCTION – IN GENERAL – INTENT**

"Courts have traditionally been reluctant to infer legislative intent from legislative inaction when there are several possible reasons for [a proposed amendment's] defeat." *Goldstein v. State*, 339 Md. 563, 570 (1995). And, in this case, the General Assembly expressly indicated an "intent" to "abrogate the holding of the Court of Appeals in [*Tracey v. Solesky*, 427 Md. 627 (2012)]" and not to "affect . . . [a]ny other common law or statutory cause of action." *See* CJP § 3-1901(d)(1).

**STATUTES – CONSTRUCTION – IN GENERAL – CONSTRUCTION BASED ON MULTIPLE FACTORS**

Looking at CJP § 3-1901 in light of the "stated intent," we are not persuaded that the legislation was intended to change the common law related to strict liability for personal injury beyond the creation of the rebuttable presumption the owner knew or should have known of the dog's vicious propensities and precisely when the court can rule on whether that presumption has been rebutted as a matter of law. For that reason, the General Assembly may have rejected the inclusion of the proposed "ownership" definition as unnecessary because it was clear under common law liability extended to "keepers." For example, the majority opinion in *Tracey*, 427 Md. at 638, discussed "owning or keeping" a dog with respect to strict liability:

> At common law, the owner of a dog is not liable for injuries caused by it, unless it has a vicious propensity, and notice of that fact is brought home to him. But when it is once established that the dog is of a vicious nature, and that the *person owning or keeping* it has knowledge of that fact, the *same responsibility attaches to the owner to keep it from doing mischief as the keeper of an animal* naturally ferocious would be subject to, and proof of negligence on the part of the owner of the dog is unnecessary.

(quoting *Batchman v. Clark*, 128 Md. 245, 247 (1916)) (emphasis added). *See also Twigg v. Ryland*, 62 Md. 380, 385 (1884) (stating that "[t]he owner or keeper of the dog or other domestic animal must be shown to have had knowledge of its disposition to commit such injury).

**ANIMALS – INJURIES TO PERSONS – DOGS – PERSONS LIABLE FOR INJURIES IN GENERAL**

Merely permitting a dog to remain on one's property may not be enough to establish ownership. But, exercising some degree of care and control of a dog on one's premises may be sufficient to establish liability.

Circuit Court for Howard County
Case No. 13-C-18-114301

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 977

September Term, 2019

_____

MARY PAONE LATZ

v.

JACOB PARR

_____

Kehoe,
Gould,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kenney, J.

_____

Filed: July 6, 2021



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

On August 15, 2015, a dog named Ravyn chased a cat named Shadow into the apartment of Mary Paone Latz, Shadow's owner and appellant. In her effort to protect Shadow, Ms. Latz was injured. She sued Jacob Parr, appellee, and Vicki Nichols, Mr. Parr's longtime girlfriend, in the Circuit Court for Howard County for negligence and strict liability. After Ms. Nichols filed for bankruptcy, Ms. Latz dismissed the claims against Ms. Nichols. Trial commenced on June 25, 2019. On the second day of the two-day jury trial, the circuit court granted Mr. Parr's motion for judgment at the close of Ms. Latz's case.

In her timely appeal, Ms. Latz asks: "Did the circuit court err when it granted Mr. Parr's motion for judgment?"[1] For the reasons that follow, we answer that question in the affirmative and reverse the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Latz was sitting on her patio when Ravyn, a seventy-to-eighty-pound dog, ran into her apartment through an open door chasing Shadow. She pursued the dog into a back bedroom where Ravyn "had Shadow pinned, cornered under the bed between the bed and the file cabinet." To prevent injury to the cat, she "grabbed the dog" by the collar. While restraining the dog, she injured her neck and left arm. Ms. Latz's husband, who was in the shower, came and removed the dog from their residence.

According to Mr. Parr, Ravyn was adopted from an animal-rescue facility in Maryland. On the day of the incident, she was approximately two-and-a-half-years old.

---

[1] Mr. Parr has asked in a conditional cross-appeal whether the circuit court erred or abused its discretion in the summary denial of his motion for summary judgment.

When asked about the adoption, Mr. Parr testified that he and Ms. Nichols picked Ravyn up from a pet store in Maryland:

> [Mr. Parr]: That's where we met the group – actually we met the group there, but Rayvn we adopted such we didn't touch her. We have pictures, we adopted her off of pictures. And that's – then we picked her up.

Mr. Parr and Ms. Nichols had been in a relationship for approximately nine-and-a-half years. She works and resides in New Jersey, but "for the last nine years," she had been coming to Mr. Parr's home "about every weekend – every other weekend"; sometimes she comes on Thursday and stays until Monday. Ravyn usually resides with Ms. Nichols.

Mr. Parr testified that his home is approximately 100 yards from where Ms. Latz and her husband rented a basement apartment in the home of James Leslie. On the day of the incident, he and Ms. Nichols took three dogs for a walk.[2] According to Mr. Parr, he had Roo and Snickers on a single leash, and Ms. Nichols had Ravyn on a leash. They were walking on Mr. Leslie's property "when [Ravyn's] leash broke – when the collar broke." According to Mr. Parr, the collar came off the dog's neck, and remained attached to the leash held by Ms. Nichols.

Mr. Leslie, the Latzes' landlord and Mr. Parr's neighbor, testified that when Mr. Parr and Ms. Nichols were walking on his property that day they "stopped to talk." During Mr. Leslie's deposition, which was read at trial, Ms. Latz's counsel asked him if Mr. Parr and Ms. Nichols had any dogs with them:

---

[2] Two of the dogs—Roo and Snickers—resided with Mr. Parr.

2

[Ms. Latz's counsel]: Did they have dogs with them?

[Mr. Leslie]: They had Ravyn with them.

[Ms. Latz's counsel]: Did they have any other dogs with them that you can recall?

[Mr. Leslie]: No.

[Ms. Latz's counsel]: Okay. Did either one of them have a leash?

[Mr. Leslie]: Not that I recall.

[Ms. Latz's counsel]: Okay. Do you have any understanding or any knowledge regarding how Ravyn got loose that day?

[Mr. Leslie]: No, I don't. But I never saw him on a leash.

\* \* \*

[Ms. Latz's counsel]: On the day of the incident when Ravyn was loose, did you see either Vicki Nichols or Jacob Parr chasing after Ravyn?

[Mr. Leslie]: No

[Ms. Latz's counsel]: Did it appear to you that they were trying to catch her[?]

[Mr. Leslie]: No

Mr. Leslie didn't recall seeing a broken collar and neither Mr. Parr nor Ms. Nichols told him that Ravyn's collar had broken.

When asked about seeing Ravyn on prior walks, he testified:

[Ms. Latz's counsel]: Had you see[n] Mr. Parr or Ms. Nichols walking Ravyn before?

[Mr. Leslie]: Yes.

[Ms. Latz's counsel]: Okay. Was –

3

[Mr. Leslie]: Well walking him not in the sense of on a leash, but he was with them.

[Ms. Latz's counsel]: So he wouldn't have been on a leash when you saw him?

[Mr. Leslie]: That's correct.

[Ms. Latz's counsel]: Did you ever see Ravyn on a leash?

[Mr. Leslie]: Not that I recall.

He added that, prior to this incident, he had seen Ravyn running without a leash "[t]hree, four, five [times], somewhere in that ballpark."

Ms. Latz testified that she saw Ravyn loose "[a]l the time," and that she "would see [Mr. Parr] bring the dog out, hook it on an area that he had prepared for Ravyn" that "had a drill thing with a wire and [she saw] him take [Ravyn] off the leash."[3] According to her, she and her husband "were always giving Ravyn back to Mr. Parr." Mr. Latz testified that, prior to the incident, he had retrieved Ravyn "running at large" and returned the dog to Mr. Parr "about a half dozen times."

According to Mr. Latz, he was in the shower when he heard his wife yelling "Eddie help, Eddie help." He exited the shower and saw the dog "pulling [Ms. Latz] from direction to direction just going back and forth." Mr. Latz grabbed the dog by its collar and exited the apartment to return the dog "to [Mr. Parr's] house." When he saw Ms. Nichols at the corner of the house, he handed the dog to her. According to Mr. Latz, Ms. Latz began complaining of pain "within an hour, maybe two hours" of the incident.

---

[3] The circuit court stated "[t]here was testimony about something that screws into the ground with a tether on it."

At the close of Ms. Latz's case, the circuit court granted Mr. Parr's motion for judgment:

> We're dealing with the State of the evidence as it is. And the State of the evidence as it is is that the dog was adopted. Mr. Parr used the word we. He did not explain that further to suggest that it was either the royal we or intended to be a co-ownership we. Nobody has presented ownership papers of the dog. When you adopt you put names down and things like that.

> The vet form is the closest thing we have to somebody putting a name on something. Mr. Parr's name appears on the vet form as the client. Ms. Nichols I presume is on there as Vicki . . . But I recognize the area code 908. The phone number appears to be a New Jersey phone number.

> The evidence is that they see each other every weekend. The evidence is that when they are not together whether it be in New Jersey or in Maryland the dog – and when I say the dog, I'm talking about Ravyn not the two little ones. The dog is in the care and custody of Vicki Nichols. She makes the decision of where the dog goes. She makes the decision of what vet the dog sees, if any. She makes the decision of what the dog eats. She makes the decision of if the dog is in doggy daycare or not. She in my mind is the owner of the dog and that's the evidence. She's the owner of the dog in that she has legal rights to the dog.

> \*      \*      \*

> The evidence of what happened in this event is that Mr. Parr and Ms. Nichols left the property. They were no longer on the Parr Property. That Ms. Nichols was present. The Plaintiff disputes that a leash was ever used, but the evidence is that Ms. Nichols was present and that whatever occurred that would cause the dog to become at large occurred off of Mr. Parr's property. And there's no evidence that Mr. Parr was responsible for it as opposed to Ms. Nichols.

> As such I'll grant the motion for judgment as to counts – as to both counts.

# DISCUSSION

## *Standard of Review*

In regard to Md. Rule 2-519(b), we have explained:

The same standard of review applies for a motion for judgment notwithstanding the verdict and a motion for judgment at the close of the evidence. *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 329 (2012). For both motions, we consider "whether on the evidence presented a reasonable fact-finder could find the elements of the cause of action by a preponderance of the evidence." *Id.* We "assume the truth of all credible evidence on the issue and any inferences therefrom in the light most favorable to the [appellee], the nonmoving part[y]." *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md. App. 662, 683 (2007). "Consequently, if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration." *Id.* (quoting *Tate v. Bd. of Educ. of Prince George's C[n]ty.*, 155 Md. App. 536, 545 (2004)).

*Six Flags Am., L.P. v. Gonzalez-Perdomo*, 248 Md. App. 569, 581 (2020), *cert. denied sub nom. Gonzalez-Perdomo v. Six Flags Am.*, No. 445, SEPT. TERM, 2020, 2021 WL 1256731 (Md. Mar. 26, 2021).

## *Contentions*

Ms. Latz contends that the "circuit court erred when it granted the defense motion for judgment dismissing [her] claims for negligence and strict liability against Parr" for four reasons: (1) "it adopted an erroneous definition of 'owner'"; (2) it "concluded – as a matter of law – that a rational trier of fact could not find that the dog – running loose – was under the dual or joint authority of both Parr and Nichols when they took the dog for a walk . . . off leash immediately prior to" injuring her; (3) it failed to view the evidence in the light most favorable to her and concluded that the dog's flight occurred off the Parr

6

property; and (4) when it failed to apply the statutory presumption under Md. Code Ann. (1973, 2013 Repl. Vol., 2019 Supp.), Cts. & Jud. Proc. Article ("CJP") § 3-1901(a).

Mr. Parr contends that the "court properly granted [his] Motion for Judgment" because Ms. Latz "failed to produce competent evidence to establish that [he] was the owner of the subject dog or otherwise breached any duty owed to [her]."

*Analysis*

Our analysis begins with CJP § 3-1901, which provides:

In general

(a)(1) In an action against an owner of a dog for damages for personal injury or death caused by the dog, evidence that the dog caused the personal injury or death creates a rebuttable presumption that the owner knew or should have known that the dog had vicious or dangerous propensities.

(2) Notwithstanding any other law or rule, in a jury trial, the judge may not rule as a matter of law that the presumption has been rebutted before the jury returns a verdict.

Common law of liability that existed on April 1, 2012

(b) In an action against a person other than an owner of a dog for damages for personal injury or death caused by the dog, the common law of liability relating to attacks by dogs against humans that existed on April 1, 2012, is retained as to the person without regard to the breed or heritage of the dog.

Defenses

(c) The owner of a dog is liable for any injury, death, or loss to person or property that is caused by the dog, while the dog is running at large, unless the injury, death, or loss was caused to the body or property of a person who was:

(1) Committing or attempting to commit a trespass or other criminal offense on the property of the owner;
(2) Committing or attempting to commit a criminal offense against any person; or

7

(3) Teasing, tormenting, abusing, or provoking the dog.

Construction with common law

(d) This section does not affect:

(1) Any other common law or statutory cause of action; or
(2) Any other common law or statutory defense or immunity.

Neither the term "owner"[4] nor the term "at large" are defined in CJP § 3-1901.[5] For the purposes of this case, the question is whether "owner" in CJP § 3-1901 was intended to include keepers and harborers as it did at common law in a strict liability case.

In enacting CJP § 3-1901, the General Assembly stated its intent to "abrogate the holding of the Court of Appeals in *Tracey v. Solesky*, 427 Md. 627 (2012)." 2014 Md. Laws, Chap. 49. And, in doing so, to retain in actions "against a person other than an owner," the common law existing on April 1, 2012.

---

[4] As we discuss in more detail later, the General Assembly rejected an amendment to Senate Bill 247, which included, among other changes, a definition of "owner." *See* SB 247 (2014 Regular Session), Rejected Amendment to SB 247, 2/26/14, 493827/01.

Prior to the 2002 recodification of Article 27 into the Criminal Law Article, the predecessor statute to CL § 10-619, Art. 27, Section 70E(a)(3) defined "owner" as "any person or local entity that has a possessory right in a dog." When the Criminal Law Article was enacted, the session laws explained that the definition was "deleted as surplusage." 2002 Md. Laws, Chap. 26.

[5] Nor is the term "owner" (of a dog) defined by Md. Code, § 10-619 of the Criminal Law Article ("CL") (governing dangerous dogs) and CL § 10-623 (governing leaving dogs outside and unattended by use of restraints).

Prior to April 1, 2012, recovery for injuries caused by a dog could be pursued under theories of both negligence and strict liability. As this Court explained in *Slack v. Villari*, 59 Md. App. 462, 470 (1984), "negligence that exposes an animal owner who is unaware of the animal's dangerous propensities" is the "failure to control the [dog] or prevent the harm caused by it." *See also Moura v. Randall*, 119 Md. App. 632, 644 (1998).

As Mr. Parr recognizes, "a county leash law or animal control law" can be applicable to the negligence analysis.[6] As we said in *Slack*, 59 Md. App. at 471 (citing *Whitt v. Dynan*, 20 Md. App. 148, 154–55 (1974)), the violation of a statute or local ordinance "establishes a *prima facie* case of negligence where the violation is the proximate cause of the accident or injury, but does not constitute *negligence per se*." But to be evidence of negligence, the injury must be to a member of the class the ordinance "was designed to protect and the injury sustained must be the type which the statute was intended to prevent." *Id.* (internal citation omitted). These determinations are questions of law to be made by a judge. *Id.*

---

[6] We note that under Howard County Code, "owner" is defined in § 17-300(w) as "a person who keeps, possesses, harbors, has custody of, exercises control over, or has a property right in any animal, residence, or facility," and under § 17-302(a)(1) it is a nuisance when a dog "runs at large" and a dog may be declared "dangerous" under § 17.303(2)(i) if "[w]ithout provocation" it "kill[s] or inflict[s] severe injury on a person or a domesticated animal." The dog is "at large" under § 17.300(h)(1)(i) and (ii) when it is "[o]ff the property of its owner" and not "secured by a leash or lead and under the control of a responsible person capable of immediate and effective restraint of the [dog]."

9

This Court has looked to animal control statutes in determining whether a particular defendant's violative conduct was evidence of negligence. *See, e.g., Moura*, 119 Md. App. at 647 (considering whether the defendant violated Montgomery County Code 5-26, which prohibited an owner from permitting a dog to "run at large"); *Hammond v. Robins*, 60 Md. App. 430, 437 (1984) ("appellant violated the Carroll County Animal Ordinance by not keeping the dog under restraint and by allowing the dog to leave the property unattended and unrestrained").

We interpret local ordinances, such as the Howard County Code, "under the same canons of construction that apply to the interpretation of [state] statutes." *Kane v. Bd. of Appeals of Prince George's Cnty.*, 390 Md. 145, 161 (2005) (quoting *O'Connor v. Balt. Cnty.*, 382 Md. 102, 113 (2004)). And, with few exceptions, Maryland County animal control ordinances include within the definition of "owner" those who harbor, keep, or possess an animal.[7]

The Court of Appeals in *Tracey*, 427 Md. at 642, after reconsideration,[8] changed the common-law rule with respect to dog attack cases by:

> modifying one of the elements that must be proven in cases involving pit bull attacks from knowledge that a particular dog is dangerous to knowledge that the particular dog involved is a pit bull. If it is a pit bull the

---

[7] The circuit court in this case stated that it had "no doubt that the law acknowledges harboring," and it indicated that "Mr. Parr did take some measures of care in general when dealing with Ravyn on his property." But, in the court's view, "the harborer's duty" would not "extend beyond the property line" unless the dog escaped as the result of a negligent act on the property.

[8] The holding originally referred to "a pit bull or a pit bull mix."

danger is inherent in that particular breed of dog and the knowledge element of *scienter* is met by knowledge that the dog is of that breed.

It held that:

> upon a plaintiff's sufficient proof that a dog involved in an attack is a pit bull or a pit bull mix, and that the owner, or other person(s) who has the right to control the pit bull's presence on the subject premises (including a landlord who has the right and/or opportunity to prohibit such dogs on leased premises as in this case) knows, or has reason to know, that the dog is a pit bull . . . that person is strictly liable for the damages caused to a plaintiff who is attacked by the dog on or from the owner's or lessor's premises.

*Id*. at 652.

> The Court of Appeals has explained:

> When conducting a statutory construction analysis, [an appellate court's] principal goal is to determine the legislative intent underlying the relevant statutes. *See Downes v. Downes*, 388 Md. 561, 571 (2005). "We begin our analysis by looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Brown v. State*, 454 Md. 546, 551 (2017).

*Shealer v. Straka*, 459 Md. 68, 84 (2018).

Our "inquiry is not limited to the particular statutory provisions at issue on appeal." *Town of Forest Heights v. Md.-Nat'l Cap. Park & Planning Comm'n*, 463 Md. 469, 479 (2019). We "may also analyze the statute's 'relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.'" *Blackstone v. Sharma*, 461 Md. 87, 114 (2018) (quoting *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 515 (1987)).

In abrogating the holding in *Tracey*, the General Assembly created in CJP § 3-1901(a) "a rebuttable presumption that an owner knew or should have known that the dog had vicious or dangerous propensities," and that whether "the presumption has been rebutted" could not be ruled on "as a matter of law" by a judge "before the jury returns a verdict."

Judge Greene, in his dissent in *Tracey*, 427 Md. at 658–58, summarized the pre-*Tracey* common law in regard to strict liability:

> Until today, the common law in Maryland was that *the owner or keeper* of a dog or other domestic animal would be held strictly liable for injuries caused by that animal, provided the plaintiff could show that *the owner or keeper* "had knowledge of [the animal's] disposition to commit such injury[.]" *Twigg v. Ryland*, 62 Md. 380, 385 (1884) (noting that "[t]he gist of the [strict liability] action is the keeping [of] the animal after knowledge of its mischievous propensities").
>
> *       *       *
>
> Under Maryland law, "the owner's [strict] liability arises from exposing the community to a known dangerous beast rather than any negligence in keeping or controlling his animal." *Slack v. Villari*, 59 Md. App. 462, 473 (1984) (citing William L. Prosser, *Handbook of the Law of Torts* § 76, at 499 (4th ed.1971)). The burden is on the plaintiff to establish "that the owner [or keeper of the animal] knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm." *Herbert v. Ziegler,* 216 Md. 212, 216 (1958) (citations omitted). If the plaintiff fails to show the owner or keeper's *scienter,* or knowledge, of the animal's propensity to cause the very harm inflicted, recovery for the harm caused by the animal will be denied. *See Twigg*, 62 Md. at 386.

(Emphasis added).

Unlike negligence, strict liability was not based on "keeping or controlling" the dog, but rather on having "expos[ed] the community" to the "particular mischief that was

12

the cause of the harm" when the dog's inclination or propensity to do that particular mischief "was known or should have been known." *Id.* at 473 (internal citations omitted).

Ms. Latz argues that "the plain meaning of the term 'owner' as one who possesses a dog or has control over a dog is buttressed by the statutory scheme governing animal control reflected in county codes throughout Maryland." We agree that CJP § 3-1901 and animal control provisions of county codes reflect similar purposes. "Animal control statutes are designed to protect the public against the hazards of personal injury or property damage caused by roaming animals, dogs in this instance." *Hammond v. Robins*, 60 Md. App. 430, 435–36 (1984).

During the drafting process, Senator Robert A. Zirkin proposed an amendment,[9] which was not adopted, to the statute that included a definition of owner:

> On page 1, in line 21, strike "**PERSONAL INJURY OR DEATH**" and substitute "**INJURY, DEATH, OR LOSS**".

> On page 2, strike in their entirety lines 1 through 8, inclusive, and substitute:

> "**(A) (1) IN THIS SECTION, "OWNER OF A DOG" MEANS A PERSON WHO HAS A PROPERTY RIGHT IN A DOG OR WHO KEEPS OR HARBORS A DOG.**

> **(2) "OWNER OF A DOG" DOES NOT INCLUDE A VETERINARY HOSPITAL, A COMMERCIAL KENNEL, AN ANIMAL SHELTER, OR A PET SHOP, OR AN EMPLOYEE OF A VETERINARY HOSPITAL, A COMMERCIAL KENNEL, AN ANIMAL SHELTER, OR A PET SHOP, AS TO A DOG BEING**

---

[9] Amendment to Senate Bill 247, SB0247/493827/1.

**TREATED, BOARDED, SHELTERED, OR OFFERED FOR ADOPTION OR SALE.**

**(B) (1) THE OWNER OF A DOG IS LIABLE FOR ANY INJURY, DEATH, OR LOSS TO PERSON OR PROPERTY THAT IS CAUSED BY THE DOG, UNLESS THE INJURY, DEATH, OR LOSS WAS CAUSED TO THE BODY OR PROPERTY OF A PERSON WHO WAS:**

**(I) COMMITTING OR ATTEMPTING TO COMMIT A TRESPASS OR OTHER CRIMINAL OFFENSE ON THE POPERTY OF THE OWNER OF THE DOG;**
**(II) COMMITTING OR ATTEMPTING TO COMMIT A CRIMINAL OFFENSE AGAINST ANY PERSON; OR**
**(III) TEASING, TORMENTING, ABUSING, OR PROVOKING THE DOG.**

**(2) IN AN ACTION AGAINST AN OWNER OF A DOG UNDER PARAGRAPH (1) OF THIS SUBSECTION, THE SPECIFIC BREED OR HERITAGE OF A DOG IS NOT RELEVANT TO THE DETERMINATION OF LIABILITY.**";

in lines 9 and 14 "**(B)**" and "**(C)**", respectively, and substitute "**(C)**" and **(D)**", respectively; in line 10, strike "**PERSONAL INJURY OR DEATH**" and substitute "**INJURY, DEATH, OR LOSS**"; in line 11, strike "**AGAINST HUMANS**"; and in line 12, strike "**AS TO THE PERSON**".

Mr. Parr, relying on the canon of statutory construction sometimes referred to as the "amendment rejection" theory or "rejected proposal" theory, argues that "the proposed amendment contains the very definition that [Ms. Latz] argues should be adopted when reading the statute, but that the "reject[ion] [of] this definition for inclusion significantly undercuts [Ms. Latz's] argument." He adds that "[i]f the legislature had intended the term 'owner' in the statute to include harborers and keepers, they would have adopted the proposed amendment."

Writing for this Court, Judge Zarnoch has explained:

14

The Amendment Rejection Theory is generally a type of post-enactment legislative history, where the Legislature's inaction on a bill impacts the interpretation of existing law. When embraced by a court, this doctrine equates inaction on a proposed amendment as a rejection of its alternative interpretation. *See* William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 MICH. L. REV. 67 (1988).

\* \* \*

Most amendment rejection cases have involved [its use as] a tool in statutory construction. There are numerous cases on both sides of the ledger. *Compare Goldstein v. State*, 339 Md. 563, 570 (1995) (Courts are reluctant to infer legislative intent from legislative inaction where there are several possible reasons for defeat) *with State v. Bell*, 351 Md. at 721 ("Although we have never held that the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, we have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted.") (Citation omitted).

*Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 699, *cert. denied sub nom. Goodman v. Montgomery Cnty.*, 464 Md. 585 (2019).

Because the proposed amendment was not limited to a definition of "owner," Ms. Latz discounts its use in this case. She points out that the proposed amendment in addition to the definition of "owner" also "imposed broader liability on 'owners' by excluding the qualification that the injury occur while the dog 'is running at large,'" and included "statutory exclusions for a 'veterinary hospital,' 'a commercial kennel,' 'a pet shop,' and employees of those businesses."

"Courts have traditionally been reluctant to infer legislative intent from legislative inaction when there are several possible reasons for [a proposed amendment's] defeat." *Goldstein*, 339 Md. at 570. And, in this case, the General Assembly expressly indicated an "intent" to "abrogate the holding of the Court of Appeals in *Tracey*" and not to "affect

15

. . . [a]ny other common law or statutory cause of action." *See* CJP § 3-1901(d)(1). The Court of Appeals stated in *Goldstein*, 339 Md. at 570 (quoting *Lutz v. State*, *167* Md. 12 (1934)):

> It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.

Looking at CJP § 3-1901 in light of the "stated intent," we are not persuaded that the legislation was intended to change the common law beyond the creation of the rebuttable presumption and precisely when the court can rule on whether that presumption has been rebutted as a matter of law. For that reason, the General Assembly may have rejected the inclusion of the proposed "ownership" definition as unnecessary because it was already clear under common law that keepers were treated as owners. For example, the majority opinion in *Tracey*, 427 Md. at 638, discussed "owning or keeping" a dog with respect to strict liability:

> At common law, the owner of a dog is not liable for injuries caused by it, unless it has a vicious propensity, and notice of that fact is brought home to him. But when it is once established that the dog is of a vicious nature, and that the *person owning or keeping* it has knowledge of that fact, the *same responsibility attaches to the owner to keep it from doing mischief as the keeper of an animal* naturally ferocious would be subject to, and proof of negligence on the part of the owner of the dog is unnecessary.

(quoting *Batchman v. Clark*, 128 Md. 245, 247 (1916)) (emphasis added). *See also Twigg v. Ryland*, 62 Md. 380, 385 (1884) (stating that "[t]he owner or keeper of the dog

16

or other domestic animal must be shown to have had knowledge of its disposition to commit such injury).

Mr. Parr contends that "[t]here is no Maryland legal precedent that makes a property owner the *owner* of a dog merely because a dog and its owner frequently visit and/or stay at the property together." No one has cited and we have not found Maryland precedent to that effect, but some out-of-state cases are instructive.

In *Steinberg v. Petta*, 501 N.E.2d 1263, 1265 (Ill. 1986), the Supreme Court of Illinois held that the landlord was not the "owner" of a dog who bit the plaintiff in the backyard of the landlord's property. 501 N.E.2d at 1263. A jury found, under the Illinois statute,[10] that the landlord had benefited from the presence of the dog, retained control over the backyard, and had received notice from the property manager concerning tenant's complaints about the dog's presence. *Id.* at 1266. The supreme court found that this evidence was insufficient to establish "ownership" because the benefit to the landlord was "merely incidental," and that the landlord's knowledge of tenant's complaints and the dog's presence "did not establish the degree of control contemplated by the statute." *Id.*

> That the property manager would relay the neighbors' complaints about the dog to the tenants did not establish the degree of control contemplated by

---

[10] The Ill. Rev. Stat.1983, ch. 8, par. 352. defined "owner" as:

> any person having a right of property in a dog or other animal, or who keeps or harbors a dog or other animal, or who has it in his care, or acts as its custodian, or who knowingly permits a dog or other domestic animal to remain on or about any premise occupied by him."

17

the statute. The defendant was an absentee landlord, and he did not have the tenants' dog in his care, custody, or control; he simply allowed the tenants to have a pet on the premises, and by no fair inference can he be deemed to have harbored or kept the animal, as those terms are used in the Act. To find the defendant liable under section 16 of the Act in these circumstances would, we believe, expand the scope of the statute beyond that intended by its drafters.

*Id.*

A similar decision was reached in *Severson v. Ring*, 615 N.E.2d 1, 4 (Ill. App. Ct. 1993). There, the appellate court noted that the defendant knowingly permitting the dog on her premises "would seem to fit the statutory definition of 'owner'," but "the term 'owner' ha[d] been consistently construed to involve some measure of care, custody, or control" and there was no evidence that the defendant exercised any. *Id.* In both these Illinois cases, merely permitting the dog to remain on the property was not enough to establish ownership.

But, exercising some degree of care and control of a dog on one's premises may be sufficient to establish liability. In *Dufour v. Brown*, 888 N.Y.S.2d 219 (N.Y. App. Div. 2009), plaintiff and his dog were attacked by Nore, a dog owned by David Brown, while Brown was living with his girlfriend Lisa Cleveland, plaintiff's next door neighbor. *Id.* The trial court concluded that Ms. Cleveland "was not the dog's owner and the incident did not occur on her property." *Id.* Reversing the trial court, the intermediate appellate court explained:

> A person who harbors or keeps a dog with knowledge of the dog's vicious propensities is liable for injuries caused by the dog. [(citations omitted)]. The record reveals that Brown was responsible for the care and maintenance of Nore, and Nore came and went with Brown when they moved in and out of Cleveland's home. However, Cleveland permitted

18

Brown and his dog to live with her at the time of both attacks. Moreover, Cleveland witnessed Nore's vicious attack on plaintiff's dog in October 2006 after she and Brown attempted unsuccessfully to restrain Nore in Cleveland's home.

> As noted by the Court of Appeals, "it is not material in actions of this character whether the defendant is the owner of the dog or not. It is enough for the maintenance of the action that [s]he keeps the dog, and the harboring a dog about one's premises, or allowing it to be or resort there, is a sufficient keeping to support the action" (*Quilty v. Battie*, 135 N.Y. at 204, 32 N.E. 47). Cleveland, the owner of the premises, was not an out of possession landlord or mere visitor to the dog owner's home (*cf. Zwinge v. Love*, 37 A.D.2d 874, 325 N.Y.S.2d 107 [(1971)]). As there is no dispute that, at the time of the attacks, the dog lived with Cleveland, with her permission in the home that she owned, and that Cleveland exercised at least some degree of control by directing Brown to restrain the dog prior to the October 2006 attack, we find, as a matter of law, that Cleveland harbored the dog. Nonetheless, issues remain as to whether Cleveland had notice of the dog's vicious propensities sufficient to impose liability and, therefore, Cleveland's motion must be denied.

*Id.* at 220–21.

In the case before us, the circuit court stated that the evidence established that Mr. Parr was a "harborer or keeper" but not the owner of Ravyn:

> [T]he evidence is that Vicki Nichols is the owner. There's no evidence that's been presented that anybody but Vicki Nichols is the owner. And when I say the owner I'm talking about the person who has control, has a property right to the dog, a legal right to the dog, has control of the dog. Makes the decisions that owners make about the dog. The state of the case places Mr. Parr as a harborer or a keeper. That's my view of the evidence as it is.

Based on our review of the record, and "assum[ing] the truth of all credible evidence on the issue and any inferences therefrom in the light most favorable to [Ms. Latz]," we are persuaded that a "reasonable fact-finder" could find that Mr. Parr and Ms. Nichols jointly adopted Ravyn and, even though Ms. Nichols was the primary custodian,

19

that Mr. Parr was an "owner" under CJP § 3-1901. *See Six Flags Am., L.P.*, 248 Md. App. at 581. Mr. Parr testified that "we adopted" the dog in Maryland. He was designated as the client in the dog's veterinary records, and "Vicki" was designated as the client's "Spouse." Ms. Nichols and Ravyn were not mere occasional visitors at Mr. Parr's residence; Ms. Nichols and Mr. Parr were in a long-term relationship and she stayed there regularly since Ravyn's adoption two or more years before. It was Mr. Parr who set up a tethered area in his yard. In that sense, it was Mr. Parr who introduced Ravyn to the neighborhood, and it was usually Mr. Parr to whom the Latzes returned Ravyn from "running at large." Ravyn went on vacations with Mr. Parr and Ms. Nichols including to Mr. Parr's property in Ocean City. Mr. Parr was well aware of Ravyn's propensity to "door dash" and to get "loose" and that the dog did not respond to calls to come.

Simply put, the circuit court erred when it granted the motion for judgment on both counts because the evidence was "legally sufficient to generate a jury question" as to Ravyn's ownership under CJP § 3-1901(a) and should have been "submitted to the jury for its consideration." *See Six Flags Am., L.P.*, 248 Md. App. at 581. In addition, we are also persuaded that the evidence, viewed in the light most favorable to Ms. Latz, was sufficient to create a jury question under CJP § 3-1901(b) as to Mr. Parr's liability as a harborer, keeper, or possessor of the dog even if he were found not to be an owner.

Mr. Parr contends that Ms. Latz "had to show that [he] was either the owner of the dog or was otherwise under control and/or in care of the dog at the time of the subject

incident." As he sees it, "[t]he evidence at trial established that [he] was ***not*** in control of or responsible for Ravyn at the time of the incident." Again, we are not persuaded.

In dismissing the claims against Mr. Parr, the court explained:

> The evidence of what happened in this event is that Mr. Parr and Ms. Nichols left the property. They were no longer on the Parr Property. That Ms. Nichols was present. The Plaintiff disputes that a leash was ever used, but the evidence is that Ms. Nichols was present and that whatever occurred that would cause the dog to become at large occurred off of Mr. Parr's property. And there's no evidence that Mr. Parr was responsible for it as opposed to Ms. Nichols. As such I'll grant the motion for judgment as to counts – as to both counts.

Under pre-*Tracey* common law, liability is not limited to having a legal property right in the dog. Here, questions of fact existed as to Mr. Parr's control of Ravyn when she was staying at his property. *See* Md. Rule 2-519(b). We believe that a reasonable jury could conclude that Mr. Parr and Ms. Nichols had dual or shared authority over Ravyn when she was residing at Mr. Parr's and that both had an obligation to control or restrain a dog when the incident occurred.

As the circuit court noted, there was evidence supporting an inference that Ravyn was not on a leash when leaving the Parr property. Mr. Parr testified that Ravyn was on a leash and that "the collar broke" while walking on Mr. Leslie's driveway, and that, when the collar broke, it came completely off the dog's neck with the dog collar attached to the leash. Ms. Latz and her husband both testified that there was a collar on Ravyn when the dog entered their residence, and that they both grabbed the collar to restrain the dog. Mr. Leslie testified that he had never seen Ravyn on a leash and did not recall seeing either

21

Mr. Parr or Ms. Nichols with a leash and that neither were pursuing the dog in an effort to keep it from running at large.

Weighing credibility and drawing inferences is for a trier of fact, which in this case was the jury. How Ravyn became at large was a factual dispute to be resolved by the trier of fact. *See Cnty. Comm'rs of Anne Arundel Cnty. v. Cole*, 237 Md. 362, 366 (1965) ("If reasonable persons could disagree as to what the facts are or the inferences and conclusions to be drawn from undisputed facts, the question is one for the trier of the facts."). Viewing the evidence in the light most favorable to Ms. Latz, a reasonable jury could conclude that when Mr. Parr and Ms. Nichols left Mr. Parr's property, the dog was either not on a leash or when the leash broke, that they, knowing the dog was prone to run "loose" and did not respond to commands to come, were negligent in permitting Ravyn to run at large.

*Denial of Mr. Parr's Motion for Summary Judgment*

Mr. Parr, in his conditional cross-appeal, asks:

For purposes of the conditional cross-appeal, did the [c]ircuit [c]ourt err and abuse its discretion when it summarily denied [Mr. Parr's] Motion for Summary Judgment without a hearing and without any explanation?

We answer that question in the negative.

Mr. Parr contends that "[i]f this case were to be remanded to the [c]ircuit [c]ourt for further proceedings . . . his previously filed Motion for Summary Judgment should have been granted such that no trial or further litigation is required." He claims the circuit court abused its discretion when it denied his motion without providing "a short explanation for why a motion for summary judgment is denied." In his view, "the record

22

in this case leaves everyone 'guessing' as to why the motion for summary judgment was denied and provides no indication that the trial judge used the discretion with which [it] was vested."

Ms. Latz responds that "[s]etting aside that there is no requirement under Maryland law that the circuit court provide 'a short explanation' or any explanation, this Court should decline to address this argument because—given the discretion the circuit court possesses to deny motions for summary judgment under Md. Rule 2-501—such a decision is effectively unreviewable on appeal." But "[t]o the extent this Court decides to review this decision, there was no abuse of discretion here because the circuit court's order indicated it considered the motion, the opposition, and concluded that summary judgment was inappropriate."[11]

We are not persuaded that the trial court did not exercise discretion or abuse its discretion in doing so. A trial court can "enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law," but it may also exercise its discretion not to do so. *Fischbach v. Fischbach*, 187 Md. App. 61, 75 (2009) (quoting Md. Rule 2-501(f)); *see Dashiell v.*

---

[11] Ms. Latz, citing *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738 n.8 (1993), also argues that because "the judicial summary judgment rule is derived from the federal rule, judicial interpretations of the federal rule are persuasive as to the meaning and proper application of the Maryland rule." She points to *Ortiz v. Jordan*, 562 U.S. 180 (2011), in which the U.S. Supreme Court held that a party may not appeal the denial of a motion for summary judgment after a trial. A decision binding Maryland appellate courts to federal precedent on a rule should come from the Court of Appeals.

*Meeks*, 396 Md. 149 (2006). The denial of even a technically sufficient motion for summary judgment "in favor of a full hearing on the merits" does not necessarily constitute an abuse of discretion, and, in our view, it did not in this case. *See Fischbach*, 187 Md. App. at 75.

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. REMAND TO CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**